Ex parte HYDE et al.

(Circuit Court, N. D. California. September 3, 1904.)

Nos. 13,652, 13,653.

1. HABEAS CORPUS (§ 59*)—ISSUANCE OF WRIT—HEARING ON APPLICATION.

While it is usual, on an application for a writ of habeas corpus, for the court to issue the writ and dispose of the case on return, the writ may be waived, and the case considered on the facts presented in the petition, and the prisoner discharged if brought before the court and the facts warrant it.

[Ed. Note.—For other cases, see Habeas Corpus, Dec. Dig. § 59.*]

2. HABEAS CORPUS (§ 92*)—INQUIRIES—SCOPE—LIMITATION.

Where a writ of habeas corpus was issued to review the action of a United States commissioner in holding defendants to answer an indictment returned in another district, on the theory that the indictment failed to charge the defendants with the commission of any crime or offense against the United States, and that the court of the district in which the indictment was returned had no jurisdiction to try the case, the scope of inquiry was limited to the question whether the indictment charged any offense whatever within the jurisdiction of the court in which it was returned.

[Ed. Note.—For other cases, see Habeas Corpus, Dec. Dig. § 92.*]

3. CONSPIRACY (§ 43*)—NATURE OF OFFENSE—FRAUD ON UNITED STATES—EXCHANGE OF LIEU LAND—"OWNER."

Where an indictment alleged that defendants had conspired to defraud the United States by fraudulently obtaining title to state land within a forest reservation for the purpose of exchanging the same as authorized by Forest Reserve Act June 4, 1897, c. 2, 30 Stat. 34 (U. S. Comp. St. 1901, p. 1538), it stated an offense against the United States, since, when Congress provided in such act that the "owner" of land within a forest reservation might exchange his land for land open for settlement outside the reservation, the owner of a full, complete, and indefeasible title was meant, and not one who held land the title to which was subject to forfeiture for fraud.

[Ed. Note.—For other cases, see Conspiracy, Dec. Dig. § 43.*

For other definitions, see Words and Phrases, vol. 6, pp. 5134–5151; vol. 8, p. 7744.]

In the matter of the application of F. A. Hyde and Henry P. Dimond for writs of habeas corpus and certiorari. Denied.

F. J. Heney, Sp. Asst. Atty. Gen., Arthur B. Pugh and Oliver E. Pagan, Sp. Asst. U. S. Attys., and Marshall B. Woodworth, U. S. Atty., for the United States.

G. W. McEnerney and Bert Schlesinger, for defendant Hyde.

Samuel Knight, for defendant Dimond.

MORROW, Circuit Judge (orally). Two applications have been presented to the court, one on behalf of F. A. Hyde, and the other on behalf of Henry P. Dimond, for writs of habeas corpus. The petitioners allege that they are held by the United States marshal under color of authority of the United States by virtue of warrants of removal issued under section 1014 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 716), the warrants of re-

moval being dated September 2, 1904, signed by the Honorable J. J. De Haven, judge of the District Court of the United States for the Northern district of California, and that they have been committed and are detained only by virtue of said warrants and not otherwise, and not by virtue of any judgment, decree, or final order of any court or judge thereof.

Section 1014 of the Revised Statutes of the United States provides as follows:

"For any crime or offense against the United States, the offender may, by any justice or judge of the United States, or by any commissioner of a Circuit Court to take bail, * * * be arrested and imprisoned or bailed, as the case may be, for trial before such court of the United States as by law has cognizance of the offense. * * * And where any offender is committed in any district other than that where the offense is to be tried, it shall be the duty of the judge of the district where such offender is imprisoned, seasonably to issue, and of the marshal to execute, a warrant for his removal to the district where the trial is to be had."

It appears that the petitioners were indicted by the grand jury of the Supreme Court of the District of Columbia, in which indictment they are charged with having conspired with others to defraud the United States out of the possession and use of, and the title to, divers large tracts of public land of the United States open and to be opened to selection under the laws of the United States in that behalf, in lieu of lands included and to be included within the limits of certain forest reserves established and to be established by the United States in the states of California and Oregon.

The indictment is based upon section 5440 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 3676), which provides that:

"If two or more persons conspire, either to commit any offense against the United States or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not more than ten thousand dollars, and to imprisonment for not more than two years, or both fine and imprisonment, in the discretion of the court."

The petitioners are residents of this district. The indictment was accordingly sent to this district, and the petitioners were arrested here and brought before the commissioner of this district, examined with respect to the charges contained in the indictment, and were held by the commissioner to answer the charges.

Upon application to the district judge for a warrant, the district judge reviewed the proceedings before the commissioner, and determined that they should be held under the indictment, and issued his warrant for removal. The matter is now brought to the attention of this court by petition for writ of habeas corpus, and the court is urged to issue writs of habeas corpus upon the ground that there is a debatable question in this case as to whether these petitioners should be held upon this indictment and removed to the District of Columbia for trial.

[1] I have determined that I will consider the merits of the case upon this application for writs of habeas corpus. I believe I am jus-

tified in this action upon the authority of decisions of the Supreme Court of the United States approving such a course.

In the case of Ex parte Milligan, 4 Wall. 2, 18 L. Ed. 281, I find upon page 110 of 4 Wall. (18 L. Ed. 281) the following, with reference to the procedure upon petition for writ of habeas corpus:

"It is true that it is usual for a court, on application for a writ of habeas corpus, to issue the writ, and, on the return, to dispose of the case; but the court can elect to waive the issuing of the writ and consider whether, upon the facts presented in the petition, the prisoner, if brought before it, could be discharged. One of the very points on which the case of Tobias Watkins, reported in 3 Pet. 193, 7 L. Ed. 650, turned was whether, if the writ was issued, the petitioner would be remanded upon the case which he had made. The Chief Justice, in delivering the opinion of the court, said: 'The cause of imprisonment is shown as fully by the petitioner as it could appear on the return of the writ; consequently, the writ ought not to be awarded if the court is satisfied that the prisoner would be remanded to prison.'"

That opinion was followed in the case of Ex parte Royall, reported in 117 U. S. 241, 6 Sup. Ct. 734, 29 L. Ed. 868. The part of the opinion of the court to which I refer is on page 250 of 117 U. S., on page 739 of 6 Sup. Ct. (29 L. Ed. 868). The court, speaking of the proceeding in that case, said:

"It remains, however, to be considered whether the refusal of that court to issue the writ and to take the accused from the custody of the state officer can be sustained upon any other ground than the one upon which it proceeded. If it can be, the judgment will not be reversed because an insufficient reason may have been assigned for the dismissal of the petitions. Undoubtedly the writ should be forthwith awarded, 'unless it appears from the petition itself that the party is not entitled thereto'; and the case summarily heard and determined 'as law and justice require.' Such are the express requirements of the statute. If, however, it is apparent upon the petition that the writ, if issued, ought not, on principles of law and justice, to result in the immediate discharge of the accused from custody, the court is not bound to award it as soon as the application is made"—citing a number of cases.

These cases have been followed in a number of other cases that have come before the courts of the United States, so that it is clearly within the province of the court to inquire preliminarily, upon the allegations of the petition, whether it shall issue the writs of habeas corpus or not.

The objections to the warrant of removal and to the petitioners being held upon the indictment in this case are based upon the charges contained in the indictment, and not upon any matter outside of that document. It is therefore competent for the court to examine into this case upon the merits, upon this application.

[2] What is the scope of such an examination? That is the first question the court is called upon to determine. This is an application to review the action of the commissioner in holding the defendants to answer to this indictment. It is also a petition to review the action of the district judge in issuing the warrant of removal. Both proceedings are claimed to be erroneous, because: First, the indictment fails to charge the petitioner with the commission of any crime or offense against the laws of the United States, or any frauds against the United States; and, second, the Supreme Court of the District

of Columbia is without jurisdiction to try the offense, or any offense said to be set up in the indictment.

In the case of Horner v. United States, 143 U. S. 207, 12 Sup. Ct. 407, 36 L. Ed. 126, this very question of the scope of the inquiry upon writ of habeas corpus involving removal was considered by the court. It was there sought by writ of habeas corpus to test the sufficiency of the indictment upon which the petitioner was held under the lottery act for sending circulars through the mails for the sale of certain Austrian bonds, which were charged to be nothing but a scheme for a lottery. The question made on the petition for the writ of habeas corpus was that the bonds were not a lottery, within the meaning of the federal statute. The Supreme Court held that the question whether the scheme was a lottery was a question to be determined by the commissioner, by the grand jury, and by the District or Circuit Court in which the indictment was to be tried, and that it was not for the Circuit Court or for the Supreme Court, on the writ of habeas corpus, to determine this question in advance.

This case was referred to in another case, brought before Circuit Judge Taft of the Ohio Circuit, that of In re Rickett, reported in 61 Fed. 203. Judge Taft follows the case of Horner v. United States, and decided that a writ of habeas corpus would not lie to determine the question of law whether the facts proved before a United States commissioner on a preliminary hearing are sufficient to constitute the crime for which the prisoner has been committed. In this connection the court said:

"The only question which it is sought to make here on behalf of the petitioner is that the facts developed before the commissioner were not evidence sufficient to constitute the offense described in section 3892 [U. S. Comp. St. 1901, p. 2657]. That is a mere question of law, the decision of which is in the first instance committed, by section 1014 of the Revised Statutes, to the jurisdiction of the United States commissioner before whom the preliminary examination is had. * * * The writ of habeas corpus cannot be used as a writ of error to review the action of the United States commissioner within his jurisdiction. If it were a question whether the crime charged had been committed in the district to which the removal was about to be made—that is, whether the crime charged was within the jurisdiction of the courts of that district—this would be a proper proceeding to test it. If it were a question whether the act under which the prosecution is being conducted was constitutional, that, too, might be tested by habeas corpus proceedings. Not so, however, the simple question whether the facts alleged and proven are in law sufficient to constitute the crime described in the statute. That is a question for the consideration of the regular tribunals before whom it may be raised in the due procedure of preliminary examination, indictment, and trial. The writ of habeas corpus is a collateral proceeding, and its scope is limited, as above stated."

Applying these decisions to the cases now before the court, we find that the scope of the inquiry upon these applications is limited; that the question as to whether or not the indictment sufficiently charges an offense under the laws of the United States is not to be reviewed as a case would be reviewed upon a writ of error. The sufficiency of the indictment has been considered by the commissioner and by the district judge, and may again be considered by the trial court; but it is not, in any technical sense, a subject for review upon this pro-

ceeding. I am of the opinion, however, that, if the indictment does not charge any offense whatever under the laws of the United States (which is the allegation of this petition), it is the duty of the court to determine that question; and to that extent the charge contained in the indictment should be examined. Of course, the authorities hold that it is within the jurisdiction of the court, upon writ of habeas corpus, to determine whether the court that found the indictment, and to which the prisoner is about to be removed, has jurisdiction of the case. This court is required to review that question, and that upon well-settled grounds of jurisprudence. It is within the province of the court of the state where the accused is arrested to determine whether or not the court to which he is being removed has jurisdiction of the offense charged in the indictment.

I have considered very carefully the question whether or not the District of Columbia has jurisdiction of this case, and I consider the law settled. I am satisfied that it has such jurisdiction, and that that claim of the petitioners cannot be considered as entitling them to be discharged from arrest.

[3] The question which has been presented and discussed this morning with great earnestness is whether or not this indictment charges the petitioners with any crime against the United States. The indictment is not drawn in language that charges the offense described in the statute in such terms as would be called good pleading under ordinary circumstances. The charging part of the indictment is not in very clear or concise language; but it is contended that it is based on certain statutes of the United States, and refers to certain proceedings under the laws of the United States which render it necessary to make the charge of the offense in such language as is used in this indictment. Notwithstanding this explanation, it does appear that the indictment is open to criticism. But the question for this court to determine is whether or not it appears that the petitioners are charged, in general substance, in this indictment, with an offense under the laws of the United States; whether or not this indictment, under any construction of its language, may be held to charge an offense under the laws of the United States. If it does, the petitioners cannot be discharged from arrest upon writs of habeas corpus, for the reason, as said before, that this is not a court of appeals.

The objection to the indictment is that it charges these petitioners with having conspired together to obtain title to certain lands from the state of California or Oregon in the name of fictitious persons, and that the titles obtained from the state were to have been used in obtaining, by exchange under the forest reserve act, titles from the United States for lands which the United States holds and owns.

It is said that that is not an offense against the United States; that if these petitioners have conspired to secure titles from the state, and under the statutes of the United States they were entitled to exchange those titles, however fraudulently obtained, for lands belonging to the United States, the exchange does not amount to a fraud under section 5440 of the Revised Statutes of the United States.

Judge Lacombe, of the Circuit Court of New York, has taken this view of the indictment, and has held that this does not constitute an

offense. Judge Lacombe is an able judge, of recognized experience and ability in every branch of the federal jurisdiction. It is the duty of this court to give consideration to a decision from such an eminent source; but, at the same time, the duty still remains for this court to pass upon the question as an independent proposition. It is the duty of this court to determine for itself as to whether the charge in this indictment substantially states an offense against the United States. Judge De Haven, of this district, has rendered an opinion upon a review of the proceedings on the application for a warrant of removal, and has reached the conclusion that, while the language of the indictment is open to criticism, nevertheless, in his opinion, it does charge an offense. His decision appears to have been reached after careful consideration, and I have great respect for his judgment in the case. But this does not relieve me from the duty of reaching an independent judgment of my own.

The charging part of the indictment material to be considered upon this inquiry is as follows:

"That the said Frederick A. Hyde, John A. Benson, Henry P. Dimond, and Joost H. Schneider, * * * unlawfully did conspire, combine, confederate, and agree together, and with divers other perons to the said grand jurors unknown, knowingly, wickedly, and corruptly to defraud the said United States out of the possession and use of, and the title to, divers large tracts of the public lands of the said United States, * * * in pursuance and by means of a false and fraudulent practice whereby the said Frederick A. Hyde and John A. Benson were to obtain fraudulently from the said states of California and Oregon title to and possession of school lands lying within the limits of such forest reserves and open to purchase from those states; * * * which said school lands were to be so obtained from the said states by making and filing with the said authorities *applications for the purchase of the same*, and assignments of the same, and of the certificates of purchase thereof, *in the names of fictitious persons,* * * * and by supporting such applications with forged and fraudulent affidavits and affidavits false, and known to the said Frederick A. Hyde and John A. Benson to be false, in this, that they would purport to be, some the affidavits of real persons, and *others the bona fide sworn affidavits of the persons whose names were signed* thereto, whereas in truth and in fact the former would be the affidavits of fictitious persons and would not be the affidavits of real persons or affidavits sworn to by any person, and the latter would not be the bona fide or sworn affidavits of the persons whose names were signed thereto, because such latter affidavits would not only state that the affiants therein were persons qualified under the laws of the said state of California, or of the said state of Oregon, as the case might be, to make such applications and to purchase such lands, by reason, amongst other things, of their intending to purchase the same in good faith and for their own benefit respectively, and of their having made no contract or agreement to sell the same, while in truth and in fact none of such real persons would intend to purchase such lands in good faith for his own use or benefit at all, but would be either knowingly aiding and assisting the said Frederick A. Hyde and John A. Benson in their said fraudulent practice, or innocently acting upon their said false representations, but because, also, the said latter affidavits would not in truth and in fact have ever been sworn to at all by any of the persons whose names were signed thereto; and whereby the said Frederick A. Hyde and John A. Benson were to cause to be relinquished, assigned, transferred, and conveyed, by means of false and forged relinquishments, assignments, and conveyances, to the said United States, * * * the pretended rights of such fictitious persons respectively, and require and procure such real persons to make relinquishments, assignments, tranfers, and conveyances, either directly, or indirectly through the said Frederick A. Hyde, or through

the said agents and attorneys of the said Frederick A. Hyde and John A. Benson, * * * of the titles to and possession of such school lands * * * in exchange as aforesaid for public lands to be selected, and for titles thereto by patent to be obtained, by and on behalf of the said Frederick A. Hyde and John A. Benson in the names of such fictitious or real persons, * * * in lieu of such school lands lying within the limits of such forest reserves as aforesaid, * * * well knowing such title to such school lands to be, as they were and would be, false, fraudulent, fictitious, void, and worthless, and the possession acquired thereunder unlawful, and intending thereby, and by afterwards selling and disposing of such public lands and patent titles to the general public, to defraud the said United States out of the possession and use of, and of the title to, the public lands so to be selected, obtained, and appropriated in lieu of such school lands as aforesaid, to the profit, gain, use, and benefit of themselves as aforesaid."

This charge, reduced to a simple term, is that the accused conspired together to obtain from the United States, under the forest reserve act, patents to lands belonging to the United States in exchange for and in lieu of school lands lying within the limits of such forest reserve, the title to which the accused had obtained, or were to obtain, fraudulently from the state by means of applications for the purchase of the same in the names of fictitious persons.

By the Act of March 3, 1891, c. 561, 26 Stat. 1103 (U. S. Comp. St. 1901, p. 1537), it is provided, in section 24 thereof:

"That the President of the United States may, from time to time, set apart and reserve, in any state or territory having public land bearing forests, in any part of the public lands wholly or in part covered with timber or undergrowth, whether of commercial value or not, as public reservations, and the President shall, by public proclamation, declare the establishment of such reservations and the limits thereof."

The Forest Reserve Act of June 4, 1897, c. 2, 30 Stat. 34, 36 (U. S. Comp. St. 1901, pp. 1538, 1541), provides as follows:

"That in cases in which a tract covered by an unperfected bona fide claim or by a patent is included within the limits of a public forest reservation, the settler or owner thereof may, if he desires to do so, relinquish the tract to the government, and may select in lieu thereof a tract of vacant land open to settlement not exceeding in area the tract covered by his claim or patent; and no charge shall be made in such cases for making the entry of record or issuing the patent to cover the tract selected: Provided further, that in cases of unperfected claims the requirements of the laws respecting settlement, residence, improvements, and so forth, are complied with on the new claims, credit being allowed for the time spent on the relinquished claims."

The purpose of this last act and the original act of March 3, 1891, was to preserve the remaining forests on the public lands of the United States from depredation and destruction. To accomplish this object, it was necessary that all lands within such forest reservations should belong to the United States for the purpose of full and complete administration and control; but Congress had previously granted to California, Oregon, and other public land states sections 16 and 36 in each township of the public lands within those states for school purposes. These lands were either held by the state for sale, or they had been sold and conveyed to private parties under the laws of the state providing for such sales. There were also settlers upon some of the lands within such reservations who had gone upon the

lands to obtain title by entry and improvement under the homestead laws of the United States, but who had not perfected their titles by the necessary residence, improvements, and so forth; and there were also others who had perfected their titles and had received patents from the United States therefor. To extinguish these titles and enable the government to obtain title and possession to all of the land within the reservation, Congress provided that a settler within the reservation might relinquish his unperfected bona fide claim, and select in lieu thereof a tract of vacant land open to settlement not exceeding in area the tract covered by his claim; credit being allowed for the time spent on the relinquished claim. The statute also provided that the owner of a tract of land within the reservation might relinquish his land and select in lieu thereof a tract of vacant land open to settlement, not exceeding in area the tract covered by his patent. Under this provision would come those who had become the owners of school lands within the reservation by state patents. Now, what did Congress mean when it provided that the *owner* of land within a forest reservation might exchange his land for land open to settlement outside of the reservation? Did it not mean the owner of a full, complete, and indefeasible title? This was the title the government had to offer for its land, and it must have been intended that the government was to receive such a title in exchange.

We had before the Circuit Court of Appeals for this circuit the question as to the title that could be exchanged under the forest reserve act, in Cosmos Exploration Co. v. Gray Eagle Oil Co., 112 Fed. 4, 50 C. C. A. 79, 61 L. R. A. 230, and, while the precise question involved in this case was not there discussed, it was determined, in effect, that the titles to be exchanged were full and complete titles, and that the government would not recognize the selection of land in lieu of land the title to which had been surrendered, until the selection had been approved in the manner provided by law, for the reason that until such approval the selection was subject to be defeated by proof, either that the land was mineral in character and therefore not open to settlement, or that it was not vacant at the time the selection was made. In other words, no rights accrued against the government until it was in a position to convey an indefeasible title. And this must be so. The government cannot deal in fraudulent titles. It cannot impose an imperfect title upon the purchasers of its lands, and it cannot be imposed upon by those who seek to exchange fraudulently acquired titles for good ones. The United States has frequently been compelled to bring suit to recover the title to land where the patent has been issued, upon the grounds that the grantees have merely secured the legal title, and that the equitable title, the right to the land, still remains in the United States, and has never gone out of it, because the title had been obtained by fraud. Any one familiar with the Spanish land grants, and the litigation that grew out of those grants, knows that a great many suits were brought by the United States to cancel those patents and recover the titles that had been conveyed, upon the allegation of fraud and upon the claim that the equitable title remained in the United States.

The conspiracy in this case is charged to be the claim of ownership

of land by the accused, the title to which they had obtained fraudulently from the state, leaving the equitable title in the state, and the exchange of the legal title alone for land to which the government had a perfect title and would convey, in exchange, a perfect and indefeasible title.

"Ownership" means the possession of the full and complete title. The books are full of decisions to that effect. To assume that Congress intended that patents should issue to lands in exchange for lands to which the parties making the exchange had no title except that acquired by fraud is to assume that Congress was proposing to engage in a most extraordinary method of disposing of the public lands. It is impossible to imagine that Congress would sanction anything of that kind. It has been forfeiting railroad land grants because it was claimed the railroads had not earned them or built the roads as Congress intended. It has forfeited grants to the states for the same reasons, and has authorized suits to recover grants for much less reason than the fraudulent transactions alleged in this indictment. It is impossible for this court to believe that Congress intended to dispose of the title to its public lands in any such way. As suggested by Judge De Haven, if the accused had gone into the Land Office and said: "We have the title to this land; but we went into the state land office and used the names of fictitious persons in our applications, and presented fictitious affidavits to obtain this land; and now we want you to give us a perfect title to land in exchange for our fraudulently acquired title"—does any one suppose that an officer of the government, while in possession of his senses, would carry out such a fraud? Does any one suppose that the Secretary of the Interior would knowingly enter into a transaction of that kind? I think, if he did, he would expect to be impeached the next day and brought before the bar of Congress.

I am of the opinion that the indictment sufficiently charges an offense under the laws of the United States, and that the Supreme Court of the District of Columbia has jurisdiction of the offense. The court therefore declines to issue the writs of habeas corpus.