IN THE

# SUPREME COURT

OF

# OREGON.

Argued November 13, 1917, modified January 8, motion to modify sustained in part and rehearing denied March 19, 1918.

## STATE OF OREGON *v.* HYDE.

(169 Pac. 757; 171 Pac. 582.)

**Public Lands—Cancellation of Deeds—Pleading.**

1. In a suit to cancel deeds to school lands for which the grantees or their successors had executed deeds to the United States as a basis for lieu land selections, an allegation that the United States had and still did refuse to accept the deeds of certain of the defendants imported that there had been no delivery of the deeds, and, though it appeared that the deeds had been recorded, demurrers on the ground that the United States was a necessary party defendant were properly overruled, as a grantee under a deed acquires no rights in the absence of a delivery.

**Woods and Forests—Forest Reservations—Indemnity and Lieu Lands.**

2. Under Act Cong. June 4, 1897, c. 2, 30 Stat. 36, providing that in cases in which a tract of land covered by an unperfected *bona fide* claim or by a patent is included within the limits of a public forest reservation the settler or owner may relinquish the tract to the government and select in lieu thereof a tract of vacant land open to settlement, title to the base lands passes to the United States on the acceptance of the deed and the approval of the selection by the General Land Office, and, though deeds have been executed and filed, title does not pass until the transfer is accepted by that office.

**Courts—Federal Decisions as Authorities in State Courts.**

3. The construction of a federal statute is for the federal courts, and the state court must follow the rule which they announce.

[As to when a decision of the United States Supreme Court is not binding on a state court, see note in Ann. Cas. 1913E, 281.]

**Public Lands—Cancellation of Deeds—Necessary Parties.**

4. Where school lands within a national forest reserve were purchased from the state in the name of dummy applicants, who imme-

diately assigned their contracts to the party for whose benefit the applications were made in violation of the statute contemplating that the purchase shall be for the benefit of the applicant, and after the execution of deeds the grantees or. their successors executed deeds to the United States as a basis for lieu land selections, and such deeds were accepted by the proper officers of the United States, the deeds from the state could not be canceled because of the fraud inducing their execution without the presence of the United States as a party, though the United States had co-operated with the state in marshaling the evidence of the fraud and had instituted adverse proceedings against the corresponding selections on the public domain.

**Public Lands—Cancellation of Deeds—Necessary Parties.**

5. That the United States cannot be sued without its consent would not authorize the court to pass a decree canceling the deeds which it could not enforce.

**Parties—Defect of Parties—Parties Entitled to Object.**

6. Where the grantors of the United States had conveyed the selected lands and had executed to the purchasers powers of attorney authorizing the selection in the names of the grantors of lieu lands and the sale of the selected lands, and the powers of attorney had been exercised and land selected and conveyed to parties who were in possession, such parties, in protection of their titles to the selected lands, were entitled to claim that the United States was the owner of the base lands, and as a corollary to that claim to urge that the controversy could not be determined in the absence of the United States as a party.

**Woods and Forests—Forest Reservations—Indemnity and Lieu Lands.**

7. Where parties relinquishing lands within a forest reservation to the United States as a basis in lieu land selections sold their selections and executed powers of attorney authorizing the purchasers to select lieu lands in their names and authorizing the sale of the selected lands, such powers of attorney were powers with an interest and were irrevocable during the lifetime of the grantors.

**Public Lands—Cancellation of Deeds—Necessary Parties.**

8. Where deeds executed by grantees of school lands or their successors to the United States and filed as a basis for lieu land selections had never been accepted by the United States and it had never been determined by the General Land Office that the grantors had title or that the deeds were effectual to pass title, the United States had no interest in the lands and was not a necessary party to a suit by the state to cancel the deeds from the state for fraud.

**Public Lands—Cancellation of Deeds—Sufficiency of Evidence.**

9. In a suit to cancel deeds to school lands, evidence *held* sufficient to establish a conspiracy to obtain such lands in fraud of the public policy of the state by procuring a large number of applications from dummy applicants, who immediately assigned their contracts, and to show that a defendant who thereby acquired deeds to thousands of acres of land was a party to the conspiracy and the author of it.

Fraud—Evidence.

10. Fraud is ordinarily established by circumstantial evidence.

Conspiracy—Circumstantial Evidence.

11. A conspiracy may be inferred from circumstances.

Public Lands—Cancellation of Deeds—Grounds.

12. Where, by means of applications in the names of dummy applicants and by false affidavits, thousands of acres of school lands were acquired from the state by nonresidents, contrary to the policy to sell only to residents who purchase for their own benefit and in quantities not exceeding 320 acres to each person, there was such fraud as justified the cancellation of the deeds, though the state received the price at which the lands were held for sale, especially as the market value of the lands subsequently increased and the state land board raised the selling price; it being probable that, if sales had been made only to qualified purchasers in amounts not exceeding 320 acres to each purchaser, the bulk of the lands would have remained available for sale at the higher prices.

Public Lands—Cancellation of Deeds—Bona Fide Purchasers.

13. In a suit to cancel deeds to school lands within a forest reserve which had been subsequently offered to the United States as a basis for lieu land selections, but which had not been accepted by the United States, it was immaterial whether purchasers of the land selected in lieu thereof were *bona fide* purchasers, as their title to the selected lands was dependent upon the title of the United States to the base lands and the United States had never acquired title to the base lands.

Public Lands—Cancellation of Deeds—Evidence.

14. In a suit to cancel deeds to school lands purchased from the state on application of dummy applicants, evidence *held* to show that a party who financed the purchases and took deeds to secure money advanced by him was a party to the conspiracy and was not an innocent purchaser.

Public Lands—Proceedings in Land Office—Jurisdiction of Courts.

15. Where deeds to school lands within a national forest reserve were obtained by fraud and the grantees or their successors executed deeds to the United States and filed them as the basis of lieu land selections, but the deeds had not been accepted by the land office, the pendency in such office of proceedings on charges against the validity of the selections of lieu lands did not prevent an action to cancel the deeds from the state, as, the United States having acquired no interest in the lands, the General Land Office had no control over them; its jurisdiction being confined to the public domain.

States—Actions by States—Laches.

16. The doctrine of laches is applicable to the state.

Public Lands—Cancellation of Deeds—Laches.

17. While it was a suspicious circumstance that 146 applications should be made within a few months to purchase state lands in a forest reserve and that deeds should issue shortly afterward to a handful of nonresidents transferring many thousands of acres of

such lands, where these matters apparently passed unnoticed by the state officials, laches was not imputable to the state in its failure to act for the cancellation of the deeds for fraud in the inception of the fraud, as notice must be more than would excite the suspicion of a cautious and wary person.

### Public Lands—Cancellation of Deeds—Laches.

18.  A delay of 15 years from 1898 to 1913 in bringing suit to set aside deeds to school lands based on fraudulent applications by dummy applicants, *held* not such laches as barred the suit, where the fraud was not discovered until 1905 and the facts were not fully known until 1908, at which time the position of innocent defendants had become fixed, and the condition and value of the lands did not change appreciably and where the marshaling of the facts involved a vast amount of investigation and painstaking labor and the charges reflected on the integrity of a number of citizens of the state necessitating careful investigation before making such charges and taking action, especially where in spite of the delay the evidence of the fraud was clear and fraud could not have been disproved.

### Public Lands—Sale of School Lands—Fraud—Ratification.

19.  It should not be assumed that the legislature has ratified sales of school lands secured by gross fraud unless the language of the statute leads unmistakably to that conclusion.

### Public Lands—Sale of School Lands—Fraud—Ratification.

20.  Sess. Laws 1899, p. 164, § 27, directed the state land board, which had been authorized to lend the school funds on farm mortgages, to foreclose all mortgages which were not adequate security and bid in the lands at its true cash value, but through mistake did not empower the board to sell land so purchased. Laws 1901, p. 304, authorized the board to bid in lands sold under foreclosure of mortgage given to secure a loan from the school fund, and provided that such lands should be held for sale and sold as opportunity might offer on the best terms obtainable, and that all sales of land theretofore made by the board were thereby ratified and confirmed, and whenever the full purchase price should have been paid title in fee simple should vest in the purchasers and their successors and assigns. *Held*, that this was passed to correct the error in the act of 1899 and related to purchases made by the state on the foreclosure of school fund mortgages and authorized sales thereof and confirmed sales theretofore made, and had no reference to sales of the state's grant lands and was not intended to confirm fraudulent purchases of such grant lands.

### Statutes—Construction—Intention.

21.  A statute is to be interpreted in accordance with the legislative intent.

### Public Lands—Cancellation of Deeds—Accounting.

22.  The state, suing to cancel deeds to school lands relinquished to the United States as the basis of lieu land selections for fraud in procuring such deeds, cannot recover the lands and also have an accounting from the grantees for money secured by them through the attempted exchange of the lands.

ON REHEARING.

**Woods and Forests—Forest Reservations—Indemnity and Lieu Lands.**

23.   Act. Cong. March 3, 1905, c. 1495, 33 Stat. 1264, repealing Act Cong. June 4, 1897, c. 2, 30 Stat. 36, providing in cases where a tract of land covered by an imperfect *bona fide* claim or by a patent is included within the limits of a public forest reservation, the settler or owner may relinquish it to the government and select in lieu thereof a tract of vacant public land open to settlement, but providing that the selections heretofore made in lieu of lands relinquished may be perfected as though the act had not been passed, does not, where title to base land relinquished in lieu of other lands to be selected from the public domain was acquired from the state by fraud vest such title in the United States, so as to preclude an attack on the title to base land by the state, where the United States had not accepted the conveyance of the base lands.

**Public Lands—Selection—Effect.**

24.   Under the regulations of the Interior Department, a selector of unsurveyed public lands acquires an inchoate right thereto which on survey and compliance with the rules entitles him to patent; hence title to base lands included in a forest reserve and relinquished in lieu of other lands is not subject to attack on the theory that there could be no relinquishment because the lieu lands were unsurveyed.

**Woods and Forests—National Forests—Selection of Lieu Lands.**

25.   As the administration of the forest reserve act is vested in the Land Department, the question whether a relinquishment of lands incorporated in a forest reserve, the owner selecting other lands in lieu thereof, is sufficiently in compliance with the rules to be accepted is solely for the Land Department.

From Crook: T. E. J. DUFFY, Judge.

In Banc.

This is a suit brought to set aside deeds to upwards of fourteen thousand acres of lands in Crook County which formerly belonged to the State of Oregon.   The suit is based on an alleged conspiracy to which the defendants Hyde, Schneider and others were parties, to secure these lands in fraud of the public policy of the state as defined by its statutes providing for the sale of its lands.   Most of the defendants are joined as parties on the allegation that they assert some interest in the property adverse to the claim of the state.

The second amended complaint on which the case was tried alleges that an act of Congress approved June 4, 1897, contained the following provision:

"That in cases in which a tract covered by an unperfected *bona fide* claim, or by patent, is included within the limits of a public forest reservation the settler or owner thereof may, if he desires to do so, relinquish the tract to the government, and may select in lieu thereof a tract of vacant land open to settlement not exceeding in area the tract covered by his claim or patent, and no charge shall be made in such cases for making the entry of record or issuing the patent; provided further, that in cases of unperfected claims the requirements of the laws respecting settlement, residence, improvements, etc., are complied with on the new claims, credit being allowed for the time spent on the relinquished claims."

It is alleged that shortly after the enactment of this legislation the defendant Hyde conceived the fraudulent purpose of acquiring the properties involved in this case which were then a part of the school lands granted by Congress to the State of Oregon. Hyde's plan was alleged to be to procure a large number of applications to purchase these lands, the purchasers assigning their contracts immediately and Hyde securing thereby state deeds running to him or parties selected by him and acting with him. The statute for the disposition of state lands in force at that time was as follows:

"When any person desires to purchase any of the lands of this state mentioned in Section 3617, he shall file an application with the said board of commissioner(s), which application shall contain a precise description of the land applied for, according to the United States survey thereof, and be accompanied by the affidavit of the applicant, taken before some notary public or county clerk, to the effect that he is over

eighteen years of age, and is a citizen of the United
States, or has declared his intention to become such
and a resident of this state, that he has not directly
or indirectly made any previous purchase of land
from this state, or any for him, which together with
the land described in the application exceeds three
hundred and twenty acres; that the proposed pur-
chase is for his own benefit, and not for the purpose of
speculation; that he has made no contract or agree-
ment, express or implied, for the sale or disposition of
the land applied for in case he is permitted to purchase
the same, and that there is no valid adverse claim
thereto by any actual settler'': Hill's Code, § 3618.

The scheme alleged in the second amended complaint
contemplated the control by the defendant Hyde of
the lands described therein and his conveyance of the
same to the United States as a basis for the selection
of lands equal in area on the public domain.   The
steps taken in pursuance of this scheme are alleged
with particularity in the second amended complaint.
Plaintiff sufficiently avers that the applications so se-
cured were made on behalf of Hyde and for his benefit,
that the affidavits made by the applicants were false
in so far as they alleged that affiants were purchasing
for their own benefit and that they had made no con-
tract, express or implied, for the disposition of the
property; that the result was the acquisition by a non-
resident of the state of many thousands of acres of
Oregon school land, although the laws of Oregon con-
template that its lands shall be sold only to residents
of the state and in quantities not exceeding three hun-
dred and twenty acres to each person.   Plaintiff
charges that this result was brought about by direct
purchase from the state, inasmuch as the applications
were all made for Hyde's benefit and the lands were
all paid for with Hyde's money.   It is alleged that the
titles were taken in the names of the defendants Hyde,

Sherman, Schneider, Morris, Baldwin and Clarke; that these parties executed and recorded deeds of relinquishment to the United States and thereupon undertook to select lands in lieu of those relinquished. It is alleged that the conspiracy resulted in the acquisition by Hyde of about forty-seven thousand acres of land and the patenting to him and his associates of about ten thousand acres of selected lands in lieu of a like acreage relinquished. It is averred that subsequent to November, 1902, adverse proceedings were instituted in the General Land Office against the remaining selections, that these proceedings are still pending and that the General Land Office refuses to patent any of the remainder of the selected lands. The thirtieth paragraph of the second amended complaint is as follows:

"That the United States of America has at all times and does now refuse to accept the deeds of defendants C. W. Clarke and F. A. Hyde for the lands hereinbefore first described, and has at all times and does now refuse to accept title to said lands for the reason that the said lands were fraudulently acquired from the State of Oregon, as hereinbefore alleged, and the said United States of America and the officers thereof having charge of the public lands in the United States have never at any time determined or decided that said F. A. Hyde and C. W. Clarke were the owners of the lands attempted to be conveyed by them to the United States and have never decided or determined that the said C. W. Clarke and F. A. Hyde are entitled to the lands attempted to be selected in lieu of said lands hereinbefore first described, and the said officers of the United States have for a long time and now do maintain and assert that the United States acquires no interest in the lands designated as base under the act of June 4, 1897, until the Land Department has determined that the selector is the owner of the base land and is entitled to a patent to the lands selected in lieu thereof; that no such determination has ever been

made as to the lands hereinbefore first described or for the lands attempted to be selected in lieu thereof.''

Facts are alleged in great detail to excuse the delay in bringing suit.

It may be said parenthetically that in the administration of the act of 1897 above quoted, a nomenclature has come into use under which the state lands surrendered are called base lands and the properties claimed in lieu thereof are known as selected lands.

The defendants, other than those charged with the conspiracy, are alleged to claim an interest in the base lands grounded on conveyances of the selected lands made to them by Hyde and Clarke. It is averred that these rights are subsequent and inferior to the rights of the state. It is charged that the lands are unoccupied and that Hyde is insolvent.

Plaintiff prays for a decree adjudging that it is owner of the property described, quieting its title as against the several defendants and canceling the state deeds issued for the property in question. In case this relief is denied in whole or in part plaintiff prays that it may be adjudged to be the owner of the equitable title to the selected lands, that the defendants may be charged as trustees for plaintiff in any interest held by them in said selected lands and finally that the defendant Hyde be required to account to plaintiff for all moneys received by him from lands sold in lieu of the lands of the State of Oregon surrendered by him.

Attached to the second amended complaint is an exhibit showing the particulars as to each piece of land conveyed by the state, its various transfers and the date of its relinquishment to the United States; also the date of the selection made in lieu of it. A large majority of these selections were made in the years

1899 and 1900, quite a number in 1901, a very few as late as 1904 and one in 1910.

The defendants F. A. Hyde, Western Lumber Company, Willamette Pulp and Paper Company, Martin Barrett, Cedar Sheep Association, Mrs. Theodore Hampe, Riverside Land and Livestock Company, Rock Springs Land and Cattle Company and Alger Logging Company demurred to the complaint. The demurrers were based in part on an alleged defect of parties in that the United States was not joined as a party defendant. The demurrers were overruled and thereupon these defendants answered. The defendants C. W. Clarke Company, Anaconda Copper Mining Company, O. S. Lewis and Henry Hewitt, Jr., also answered. All of these answers deny the allegations above quoted making up the thirtieth paragraph of the second amended complaint and all other allegations to the effect that title to the base lands had not vested in the United States; all answering defendants alleged affirmatively that the United States is the owner of the base lands and is a necessary party defendant.

All of the answering defendants except Hyde and C. W. Clarke Company alleged the conveyance to them respectively of specified portions of the selected lands in consideration of moneys paid by them without notice of any fraud or irregularity. The defendant C. W. Clarke Company alleged indebtedness due it from the defendant Hyde and from one John A. Benson and the transfer to it of sundry selected lands to secure these debts; this defendant alleged that it had made its advances and received its conveyances in ignorance of any of the matters alleged by plaintiff. The answers all allege that plaintiff knew at all times subsequent to the execution of the state deeds the facts with reference to the applications to purchase. It is

alleged that the defendants have been at expense in the care of the selected lands and the payment of taxes thereon. It is also alleged that much of the evidentiary matter on which the defendants were dependent was destroyed in the San Francisco fire of April, 1906, and that sundry material witnesses have died. The state is charged with laches in bringing this suit.

It is also affirmatively alleged in these answers that the applications to surrender and select are still pending before the General Land Office and that its jurisdiction to act in the premises is exclusive.

All of the defendants deny the allegations of fraud in applying to purchase the state lands and the allegations of conspiracy to acquire these lands unlawfully. It is not alleged by any defendant that the lands claimed by him have been patented by the United States either to him or to his predecessors in interest.

The defendants Philomen Clarke, Flora M. Sherman, Joost H. Schneider, F. A. Hyde and Company, A. S. Baldwin and Emma C. Baldwin filed disclaimers.

Plaintiff's replies joined issue on the affirmative allegations in the respective answers. Supplemental pleadings admit that since this suit was brought the General Land Office has entered adverse proceedings against certain selections of lieu land based on the relinquishment of Oregon forest reserves.

The case was tried out and a decree was passed by the lower court adjudging that plaintiff is the owner of the land in question, setting aside the state deeds executed therefor, directing the several defendants to execute conveyances to plaintiff of the properties claimed by them and awarding plaintiff a judgment against the defendant Hyde in the sum of $17,689.74.

The defendants Hyde, Hewitt, Barrett, Lewis, Hampe, C. W. Clarke Company, Rock Springs Land

and Cattle Company, Western Lumber Company, Riverside Land and Livestock Company, Willamette Pulp and Paper Company, Alger Logging Company, Anaconda Copper Mining Company and Cedar Sheep Association appeal.                         MODIFIED.

For appellants, F. A. Hyde, Henry Hewitt, Jr., Martin Barrett, O. S. Lewis, Mrs. Theodore Hampe, C. W. Clarke & Co., a corporation, Rock Springs Land & Cattle Company, a corporation, Riverside Land & Livestock Company, a corporation, Alger Logging Company, a corporation, and Cedar Sheep Association, a corporation, there was a brief and an oral argument by *Mr. A. C. Shaw.*

For appellant, Western Lumber Company, a corporation, there was a brief and an oral argument by *Mr. W. M. Bickford.*

For appellant, Anaconda Copper Mining Company, a corporation, there was a brief and an oral argument by *Mr. E. E. Hershey.*

For appellant, Willamette Pulp & Paper Company, a Corporation, there was a brief over the name of *Messrs. Griffith Leiter & Allen,* with oral arguments by *Mr. Rufus A. Leiter* and *Mr. Harrison Allen.*

For respondent, there was a brief with oral arguments by *Mr. George M. Brown,* Attorney General, and *Mr. John O. Bailey,* Assistant Attorney General.

McCAMANT, J.—1. All of the appellants assign error on the refusal of the court to dismiss the suit on the ground that the United States is a necessary party defendant. This point was raised by most of the appellants on demurrer and by all of them the question was

reserved by answer. It is averred in the thirtieth paragraph of the second amended complaint that "the United States of America has at all times and does now refuse to accept the deeds of defendants C. W. Clarke and F. A. Hyde for the lands hereinbefore first described." This allegation imports that there was no delivery of the deeds. It is elementary that in the absence of delivery the grantee in a deed acquires no rights thereunder. It elsewhere appears in plaintiff's pleading that the deeds executed to the United States and conveying the base lands in controversy were recorded, but it has been held that the recording of a deed by the grantor without the consent of the grantee does not constitute delivery: *Bogard* v. *Barhan,* 56 Or. 269, 276, 277 (108 Pac. 214). As to so much of the land as was held in the name of Hyde and Clarke the allegations are therefore sufficient to dispense with the joinder of the United States as a party, and the demurrers, in so far as they are based on this ground, were properly overruled.

2. Issue was joined by appellants on the allegations of the second amended complaint as to the refusal of the United States to accept the deeds to the base lands. In determining the effect of the evidence directed to this issue it becomes material to examine the act of 1897 and the federal decisions construing it. The statute first came before the United States Supreme Court for consideration in the case of *Cosmos Exploration Co.* v. *Gray Eagle Oil Co.,* 190 U. S. 301 (47 L. Ed. 1064, 23 Sup. Ct. Rep. 692, 24 Sup. Ct. Rep. 860). It was there held that the administration of the act was vested in the General Land Office; that it was empowered to adopt rules fixing the procedure by which base lands could be surrendered and selected lands acquired; and that the rules adopted were reasonable. The sixteenth rule so approved is as follows:

"Where final certificate or patent has issued, it will be necessary for the entryman or owner thereunder to execute a quitclaim deed to the United States, have the same recorded on the county records, and furnish an abstract of title, duly authenticated, showing chain of title from the Government back again to the United States. The abstract of title should accompany the application for change of entry, which must be filed as required by paragraph 15, without the affidavit therein called for."

The Court, speaking through Mr. Justice PECKHAM, says:

"Counsel insists that the act of June 4, 1897, constitutes a standing offer on the part of the Government to exchange any of its 'vacant land, open to settlement' for a similar area of patented land in a forest reservation, and that whenever a person relinquishes to the Government a tract in a forest reservation and places his deed to the Government of record as required by the Land Department rules, and selects in lieu thereof a similar area of vacant land open to settlement that such offer of the Government has thereupon been both accepted and fully complied with, and that a complete equitable title to the selected land is thereby vested in the selector.

"But even the complete equitable title asserted by complainant must, as it would seem, be based upon the alleged right of the local land officers to accept the deed and approve the selection, even though such approval may be thereafter the subject of a review in the nature of an appeal from the action of the local officers. There must be a decision made somewhere regarding the rights asserted by the selector of land under the act, before a complete equitable title to the land can exist. The mere filing of papers cannot create such title. The application must comply with and conform to the statute, and the selector cannot decide the question for himself.

"We do not see how it can be successfully maintained that, without any decision by any official representing the Government, and by merely filing the deed

relinquishing to the Government a tract of forest re-serve land and assuming to select a similar area of va-cant land open to settlement, the selector has thereby acquired a complete equitable title to the selected land. The selector has not acquired title simply because he has selected land which he claims was at the time of selection vacant land open to settlement, nor does the filing of his deed conveying the land relinquished and the abstract of title with it show necessarily that he was the owner of the land as provided for by the stat-ute.   So far as his action goes, it is an assertion on his part that he was the owner in fee simple of the land he proposed to relinquish, and that the deed conveys a fee simple title to the Government, and also that he has selected vacant land which is open to settlement, and that therefore he is entitled to a patent for such land. These assertions may or may not be true. * *

"It is certain, as we have already remarked, there must be some decision upon that question before any equitable title can be claimed—some decision by an offi-cer authorized to make it. * *

"What may be the decision of the Land Department upon these questions in this case, cannot be known, but until the various questions of law and fact have been determined by that department in favor of complain-ant it cannot be said that it has a complete equitable title to the land selected."

The court in that case was concerned particularly with the question of whether an equitable title to the selected lands had passed to the applicants.  But the decision is instructive on the effect of a deed to the base lands.  It is held that although the act of 1897 is a standing offer by the United States to exchange one class of lands for another, the exchange is not effected by the mere filing of the papers.  In *Clearwater Tim-ber Co.* v. *Shoshone County,* 155 Fed. 612, 620, it is held that title to the selected lands does not pass until final approval of the selection by the Commissioner of the General Land Office.  If the title to the selected lands

cannot vest in the applicant without acceptance of the base lands by the General Land Office, it is fairly inferable that title to the base lands cannot pass to the United States until this bureau accepts the transfer. It is said in *Pacific Live Stock Co.* v. *Isaacs,* 52 Or. 54, 64 (96 Pac. 460), that:

"Neither party acquires any legal or equitable title in the lands proposed to be exchanged until the acceptance or final consummation thereof."

The construction which we place upon the decision in *Cosmos Exploration Co.* v. *Gray Eagle Oil Co.,* accords with its construction by the Interior Department. In George Austin, 33 L. D. 589, 590, the Secretary of the Interior says:

"Relinquishment of lands and selection of others in lieu thereof under the Act of June 4, 1897, is essentially a contract of exchange. The relinquisher proposes to vest in the United States title and to select an equal area. The court held in *Cosmos Exploration Co.* v. *Gray Eagle Oil Co.,* 190 U. S. 301, 312, 313 (47 L. Ed. 1064, 23 Sup. Ct. Rep. 692, 24 Sup. Ct. Rep. 860), that the relinquisher's acts by filing of papers are but a representation that he has title, and that some decision upon the validity of that title must be made by some authorized officer before equitable title vests. Until such decision is made the title is *sub judice.* It may happen, and frequently has happened, that the title so tendered is upon examination found to be defective, encumbered, or even wholly bad and irremediable. In such case it is rejected, and the United States refuses to approve the selection or to give title to public lands in exchange."

It is squarely held by the federal court for this district in *United States* v. *McClure,* 174 Fed. 510, that title to the base lands does not pass to the United States until the deed is accepted by the General Land Office.

The act of 1897 again came before the federal Supreme Court in *Roughton* v. *Knight,* 219 U. S. 537 (55 L. Ed. 326, 31 Sup. Ct. Rep. 297). This case involved the right of a party who had conveyed land in a forest reserve to the United States and had deposited the deed with accompanying abstract in a United States land office, but who had neglected to select lands in lieu of this base until after the repeal of the act of 1897. In this respect he had not complied with the regulations and the court held that he had not lost title to the base lands. Mr. Justice LURTON said:

"Manifestly there must be an acceptance of the relinquishment by someone authorized to decide upon its sufficiency, and an assent to the particular selection made in lieu. * *

"That a proposal for an exchange of land within a forest reservation for lands outside may be withdrawn before acceptance is an obvious proposition. There having been no contract in force between this appellant and the Secretary of the Interior at the date of the repeal, he had no right to save under the exceptions in the repealing act."

3. The Arizona court has held that title to the base lands vests in the United States on the filing for record of the deeds of relinquishment: *Territory* v. *Perrin,* 9 Ariz. 316 (83 Pac. 361). But the construction of a federal statute is for the federal courts and it is for us to follow the rule which they announce.

The latest case in the Supreme Court of the United States construing the act of 1897 is *Daniels* v. *Wagner,* 237 U. S. 547 (Ann. Cas. 1917A, 40, L. R. A. 1916A, 1116, 59 L. Ed. 1102, 35 Sup. Ct. Rep. 740). In this case it is held that the power of the General Land Office in administering the act in question is not arbitrary; that when it has adjudged that the applicant has complied with the regulations, he becomes equitable owner of

the selected lands and that the General Land Office has no power to approve a junior entry of these lands or to issue a patent to such junior entryman. Under the facts of that case the selected lands had never been passed for patent; all that had been done was to approve of the application as made in conformity to law and the regulations of the Department. It must be borne in mind that all transactions had under the act of 1897 are exchanges of real property. Title to the selected lands cannot pass to the applicant until title to the base lands has passed to the United States. The case of *Daniels* v. *Wagner* therefore decides that title to the base lands passes to the United States when the application is approved by the General Land Office. The title so acquired may be voidable for fraud or mistake; the General Land Office may have power for good cause to rescind its approval and withhold patent to the selected land. It is enough for present purposes that, under the construction given this federal statute by the federal Supreme Court, title to the base lands passes to the United States on the acceptance of the deed and the approval of the selection by the General Land Office.

It remains to apply these principles to the facts disclosed by the record. The evidence shows that deeds to the great bulk of the acreage of the base lands were filed with the registers and receivers of the land offices for the districts in which the selected lands were located; that these deeds were regular in form; that they were executed in each case by the party who had acquired on the face of the records the title originally held by the State of Oregon; and that in each case the United States was grantee. The grantors in these deeds parted with control over them. The deeds were left with the proper officers of the grantee. In each

case the deeds were accompanied with abstracts of title showing that these deeds were effectual to pass title and that the lands were free from tax liens and other encumbrances.

Based on these relinquishments of base lands applications were made to select equivalent designated acreage on the public domain. As to the lands tabulated as Supplement A to this opinion, aggregating 10,204.43 acres, the applications were approved by the General Land Office. As to the lands tabulated as Supplement B, aggregating 3,638.75 acres, the record fails to show any such approval. As to the lands tabulated as Supplement C, aggregating 251.56 acres, the record fails to show that the lands were ever offered to the General Land Office.

4. The first question which confronts us on this record is whether this controversy as to the lands listed in Supplement A can be litigated without the presence in court of the United States as a party. In its essence the suit is one for the cancellation of deeds whose execution has been induced by fraud. The state's grantee has conveyed each parcel of the land involved, either directly or by mesne conveyances, to the United States. These deeds have been delivered and recorded.

While the deeds were executed and recorded by the grantors without the knowledge of the grantee, they were placed of record pursuant to a standing offer made by the grantee to accept these lands in exchange for other lands owned by it. The deeds with accompanying evidences of title were subsequently accepted by the officers of the grantee who were authorized to speak for it in that behalf. Clearly these deeds when so accepted passed title to the base lands to the United States. While the General Land Office has instituted adverse proceedings against the corresponding selec-

tions on the public domain, there has been no recon-
veyance by the United States of the base lands, nor
have the deeds to these base lands been returned to
the grantors, as was done in *Roughton* v. *Knight,* 219
U. S. 537, 548 (55 L. Ed. 326, 31 Sup. Ct. Rep. 297).
It is true that the United States will not knowingly
accept title to base lands acquired by fraud: *Ex parte
Hyde,* 194 Fed. 207, 214, 215; *Thomas B. Walker,* 39
L. D. 64; *Hiram M. Hamilton,* 39 L. D. 607. It may be
that for this reason the title of the United States to
these lands is defeasible, but the United States is not
before us as a party. Can a grantor whose deed has
been secured through the fraud of the grantee litigate
the question of title arising out of the grantee's fraud,
in the absence of the successor in interest of the gran-
tee to whom the property has been conveyed?

*Talbott* v. *Leatherbury,* 92 Md. 166 (48 Atl. 733), was
a suit to set aside a deed alleged to have been executed
in fraud of the grantor's creditors. The deed created
a trust in favor of the grantor's children. These
children were not joined as parties, but the lower court
nevertheless entered a decree canceling the convey-
ance. This decree was reversed on appeal, the court
saying:

"The deed may have been fraudulent in fact and
may have been executed under such circumstances as
to have induced a court of equity to set it aside upon a
proper application made for that purpose by the credi-
tors of the grantor. Before, however, a decree to set
it aside could have properly been passed, the well-
settled principles of equity pleading required that all
parties having any interest in the property under the
terms of the deed should have been brought before the
court, and have had an opportunity to answer the bill
and be heard in their own behalf."

It is a rule universally recognized that in a suit for the avoidance or cancellation of a deed, the successor in interest of the grantee is an indispensable party defendant: Wait on Fraudulent Conveyances (3 ed.), § 131; Bump on Fraudulent Conveyances (2 ed.), 536; *Cook* v. *Lake,* 50 App. Div. 92 (63 N. Y. Supp. 818, 820); *Sage* v. *Mosher,* 28 Barb. (N. Y.) 287, 289; *Hammond* v. *Hudson River Iron etc. Co.,* 20 Barb. (N. Y.) 378, 383; *Gray* v. *Schenck,* 4 N. Y. 460; *Stillwell* v. *Stillwell,* 47 N. J. Eq. 275 (20 Atl. 960, 24 Am. St. Rep. 408); *Terhune* v. *Sibbald,* 55 N. J. Eq. 236 (37 Atl. 454); *Simon* v. *Ellison,* 90 Va. 157 (17 S. E. 836); *Smith-Dimmick Lumber Co.* v. *Teague,* 119 Ala. 385 (24 South. 4, 10); *Sloan* v. *Hunter,* 56 S. C. 385 (34 S. E. 658, 660, 879, 76 Am. St. Rep. 551); *Low* v. *Pratt,* 53 Ill. 438.

The rule announced in the foregoing authorities is but an application of the general principle that jurisdiction will not be exercised when the court is without power to enforce its adjudication: *State* v. *North American Land etc. Co.,* 106 La. 621 (31 South. 172, 87 Am. St. Rep. 309, 318–320); *Western Union Tel. Co.* v. *Western etc. R. R.,* 8 Baxt. (67 Tenn.) 54, 61; 7 R. C. L. 1029. It is said in Broom's Legal Maxims, 209, that:

"The law will not itself attempt to do an act which would be vain."·

It is a principle of the law of *mandamus* that the writ will not issue when the court lacks power to enforce it: High on Extraordinary Legal Remedies (3 ed.), 14; 18 R. C. L. 139, 140; *State* v. *Perrine,* 34 N. J. L. 254, 257.

Specific performance will not be granted where the court is powerless to compel obedience to the decree:

36 Cyc. 572; Fry on Specific Performance (5 ed.), § 830, p. 417; *Whitney Company* v. *Smith,* 63 Or. 187, 191, 192 (126 Pac. 1000); *Bannerot* v. *Davidson,* 226 Pa. St. 287 (75 Atl. 417).

Where, pending an appeal, conditions change so as to deprive the court of power to grant the relief sought, the appeal will be dismissed: *State* v. *Grand Jury,* 37 Or. 542 (62 Pac. 208); *Moores* v. *Moores,* 36 Or. 261, 264 (59 Pac. 327); *Portland* v. *Investment Co.,* 59 Or. 598 (117 Pac. 991).

*Cantwell* v. *Barker,* 62 Or. 12, 14 (124 Pac. 264), was a suit to enforce specifically a contract for the purchase of real property. It was held that a purchaser at execution sale of the interest of the vendor was a necessary party defendant.

In the absence of the United States as a party no court can pass a decree which would be effectual to restore these lands to the State of Oregon. The decree of the lower court was ineffectual for that purpose. No careful purchaser would pay value for these lands in the absence of a decree or a conveyance terminating the interest which the United States holds and which is apparent on the face of the Crook County records.

The record shows that the federal officials have co-operated with plaintiff's counsel in marshaling the evidence adduced in this case, and from this circumstance it is argued that the United States desires these lands restored to the State of Oregon. If this is so, the desire could be made effective by a reconveyance of the lands, by a disclaimer filed in the cause or by an appearance which would qualify the Oregon courts to determine the controversy.

It is argued by plaintiff that certain of the letters approving selections involved in this case should be

disregarded because they were written by officials of
the General Land Office who had accepted bribes to
expedite the selections and that certain additional let-
ters should be ignored because the selected lands were
unsurveyed.   We think these matters cannot be liti-
gated in the absence of the United States as a party.
When the deeds to the base lands were accepted, the
United States acquired a title.   It may have been a
bad title, subject to be divested by a court of competent
jurisdiction, but the title cannot be adjudicated in a
cause to which the United States is not a party.

5. Plaintiff cites *The Siren,* 7 Wall. (U. S.) 152 (19
L. Ed. 129) ; *The Davis,* 10 Wall. (U. S.) 15 (19 L. Ed.
875), and other authorities to the effect that the United
States cannot be sued without its consent.   This pre-
cept does not authorize this court to pass a decree
which we cannot enforce.   The principle that the
United States cannot be sued without its consent does
not vitalize decrees which are ineffective because the
United States was not before the court as a party.
The case of *United States* v. *Insley,* 130 U. S. 263 (32
L. Ed. 968, 9 Sup. Ct. Rep. 485), is instructive.   The
United States had recovered judgment against Moses
McElroy and this judgment was a lien on a piece of
property subject to a prior mortgage.   Pending a fore-
closure suit to which the United States was not a party,
an execution was sued out on the government's judg-
ment and the property was purchased by the United
States.   The foreclosure suit ·passed to decree, the
property was sold and in due time the purchaser re-
ceived a sheriff's deed.   After the lapse of many years
the United States brought suit to redeem and recovered
a decree.   It was held that the absence of the United
States as a party rendered the foreclosure decree in-
effectual to pass an indefeasible title to the purchaser

at foreclosure sale. The inability of plaintiff to sue the United States did not differentiate the case from any other case where the facts were identical. The general rule is that the inability of plaintiff to secure service upon or appearance by a necessary party defendant will not justify a court in determining the controversy in his absence. It is said in Wait on Fraudulent Conveyances (3 ed.), Section 131:

"It is the plaintiff's misfortune if he is unable to secure the presence of the necessary parties."

In the case of *Maxwell Land etc. Co.* v. *Hermiston Bank etc. Co.,* 70 Or. 218 (139 Pac. 921), we have a binding authority on the precise question involved here. Plaintiff in that case was the owner of a large body of land adapted to irrigation from the reservoirs and ditches constructed by the reclamation service of the United States in Umatilla County. It entered into an agreement with the United States to the effect that its lands should be sold "on the same conditions and under the same burdens as were provided for the sale of the United States lands in said project" and to insure fulfillment of its agreement it conveyed its lands to the defendant as trustee. Subsequently it brought suit against the trustee to cancel and set aside this trust deed, alleging that the United States had defaulted in the performance of its obligations under the contract. The Hermiston Bank and Trust Company, grantee in the trust deed, demurred on the ground that there was a defect of parties in that the United States had not been joined as a defendant. This demurrer was sustained and the suit was dismissed. The decree of the Circuit Court was affirmed on appeal. Mr. Justice EAKIN said:

"The terms of the trust deed and the consideration therefor are provided and fully appear in the contract,

and it is not possible to intelligently dispose of the case without construing the terms of the contract to ascertain whether there has been a breach thereof. This cannot be done without the presence of the parties affected by it. It is not a question of whether the trustee is an agent of the government or of the reclamation service. The trust deed cannot be considered alone. It is only a part of the execution of the contract, and thereby the reclamation service is a party to the deed as much as if signed by it, and both have to be considered together. This cannot be done without the presence of the contracting parties.

"The grounds alleged for cancellation and breach of the contract are defaults of the reclamation service, and not of the defendant, which is only the holder of the title. Such defaults or breaches cannot be determined in the absence of the party in default. He must have his day in court. Therefore, the Circuit Court did not err in sustaining the demurrer and dismissing the suit."

This decision is in harmony with two recent opinions of the federal Supreme Court. *Louisiana* v. *Garfield,* 211 U. S. 70 (53 L. Ed. 92, 29 Sup. Ct. Rep. 31), was a suit brought to establish the title of the state of Louisiana to certain swamp-lands claimed by it and to enjoin the Interior Department from disposing of them. On an examination of the record it appeared that the case raised questions of law and fact upon which the United States would have to be heard. It was therefore held that the United States was a necessary party and there was no jurisdiction to determine the controversy in its absence.

This case has been followed by the court in an opinion announced March 6, 1917, in *New Mexico* v. *Lane,* 243 U. S. 52 (61 L. Ed. 588, 37 Sup. Ct. Rep. 348). This was a suit brought by the State of New Mexico to restrain the Secretary of the Interior and the Commis-

sioner of the General Land Office from patenting forty acres of land which the state claimed as a part of its grant for school purposes. The court found that the defendants, had exceeded their authority and were plainly in the wrong. It was nevertheless held that the United States was an indispensable party defendant and the suit was dismissed because it was not before the court.

The cases last cited are the latest expression from the federal Supreme Court on the subject. They are difficult to reconcile with some of the earlier cases on which plaintiff relies. All of the cases cited by plaintiff can be readily distinguished from the case at bar. *United States* v. *Lee,* 106 U. S. 196 (27 L. Ed. 171, 1 Sup. Ct. Rep. 240), was an ejectment suit brought against the custodians of the Arlington Heights property in Virginia. They defended on the ground that the United States had acquired the property at a tax sale and that they held possession under authority of the United States. The court divided five to four on the question so raised. The majority opinion holds that the assertion by a defendant of a claim in behalf of the United States does not oust the jurisdiction of the court to try an action of ejectment; that if the claim so asserted is without merit, the fact that it is asserted on behalf of the United States does not require the court to withhold the property from its true owner. The tax title of the United States was adjudged to be invalid.

This opinion followed the decision of Chief Justice MARSHALL in *Osborn* v. *Bank of United States,* 9 Wheat. (U. S.) 738 (6 L. Ed. 204). In this case it was held that, notwithstanding that the eleventh amendment to the federal Constitution forbids a United States court to entertain a suit against a state,

injunction will lie to restrain a state officer from seizing property under a state tax statute which is unconstitutional.   *Davis* v. *Gray,* 16 Wall. (U. S.) 203, (21 L. Ed. 447), upheld the right to enjoin state officials of Texas from seizing a land grant which the legislature had undertaken to forfeit.

In all the foregoing cases the courts were competent to enforce their adjudications.   They were able to determine the controversies because their judgments and decrees could operate on persons over whom they had jurisdiction.   In this case we are dealing with unoccupied land.   The legal and record title stands in the United States.   The decree, to be effective, must operate directly on the United States.

It is held in *The Siren,* 7 Wall. (U. S.) 152, 154 (19 L. Ed. 129), and *The Davis,* 10 Wall. (U. S.) 15 (19 L. Ed. 875), that when the United States voluntarily appears, it waives its exemption so far as to allow the adverse party to try out setoffs to the extent of the demand asserted by the United States.   In this case the United States asserts no demand and has made no appearance.

The cases of *Louisiana* v. *Garfield, New Mexico* v. *Lane* and *Maxwell Land Co.* v. *Hermiston Bank & Trust Co.* are in point and are binding upon us. Under the rule announced by these authorities we are without power to determine the controversy in so far as it relates to the property listed in Supplement A.

6, 7. It is suggested that these appellants are in no position to take advantage of the absence of the United States as a party.   We think this is the one question on which they are clearly entitled to be heard.   The appellants, other than Hyde and C. W. Clarke Company, have paid valuable considerations for powers of attorney executed in their favor by the grantors in

the deeds which relinquished the base lands to the United States. These powers are twofold. One of them authorizes the selection of lieu lands of equivalent acreage to the base lands surrendered and the other authorizes the sale of the selected lands. These powers so given were to be exercised in the names of the grantors of the United States, but they were powers with an interest and were irrevocable during the lifetime of the grantors aforesaid: *Hunt* v. *Rousmanier*, 8 Wheat. (U. S.) 174, 202 (5 L. Ed. 589); *Frink* v. *Roe*, 70 Cal. 296, 309, 310 (11 Pac. 820); 1 Mechem on Agency (2 ed.), § 576. The record shows that these powers have been exercised. Under them lieu lands have been selected and these selected lands have been conveyed to Western Lumber Company, Willamette Pulp and Paper Company and other appellants. In some cases there have been subsequent transfers of these selected lands. These appellants, other than Hyde and C. W. Clarke Company, are in possession of the selected lands. They are entitled, in protection of their titles to the selected lands, to claim that the United States is owner of the base lands and as a corollary to that claim they are entitled to urge that there is no jurisdiction to determine this controversy in the absence of the United States as a party.

In so far as this contention relates to the property listed in Supplement A, we are of the opinion that the position of these appellants is well taken and as to this branch of the controversy the decree should be one of dismissal without prejudice. It is but just to Hon. George M. Brown, the Attorney General, and to Mr. John O. Bailey, who has ably assisted him in the preparation and trial of this case, to say that they are in no wise responsible for the condition of the record

which precludes relief as to most of the lands involved. It appears that Mr. Brown made a trip to Washington and that he earnestly requested the Commissioner of the General Land Office, the solicitor of the Interior Department and other officials of the federal government to enter an appearance in this suit on behalf of the United States. This request was persistently pressed upon these officials, but in vain. Their refusal to enter such appearance puts the United States in the position of retaining title to the base lands listed in Supplement A, withholding patents to the corresponding selected lands and refusing to consent to the adjudication of the questions in dispute, the existence of which is the only possible excuse for the inconsistent attitude of the government.

8. It remains to determine the rights of the parties in the lands listed in Supplements B and C. The deeds to these properties have never been accepted by the United States. It has never been determined by the General Land Office that the grantors in those deeds had title or that the deeds were effectual to pass title to the base lands to the United States. The effect of these deeds is clearly and concisely stated by Judge BEAN, sitting in the United States District Court for Oregon, in *United States* v. *McClure,* 174 Fed. 510, 512:

"But the title does not pass to the land offered in exchange until the deed is accepted. The mere execution and recording of a deed and the tender thereof vests no title in the government. Until the deed and title are examined and approved, it is a mere assertion by the applicant of his title and right to make the selection. * * But the equitable, if not the legal, title remains in him. The deed and tender thereof amounts to nothing more than an offer by the owner to exchange one tract of land for another, and the title does not pass to either party until the exchange is effected."

As is pointed out by Mr. Justice LURTON in *Rough-ton* v. *Knight,* 219 U. S. 537, 548 (55 L. Ed. 326, 31 Sup. Ct. Rep. 297), an offer to exchange lands under the act of 1897 is like any other offer in that it may be withdrawn at any time. The fact that these lands have been offered to the United States has not transferred to the United States any interest in them and there is no reason why we should not determine the controversy in its relation to these lands in the absence of the United States as a party.

The first question to be noted is one of fact. Were the applications to select these lands fraudulent, as alleged by plaintiff?

9. The conspiracy is clearly proved. In the summer of 1898 the defendant Hyde sent the defendant Schneider to Oregon to secure applications from residents of Oregon to purchase state lands located in forest reserves. He gave Schneider letters of introduction and put at his disposal bank accounts in Portland and Salem banks. Through the facilities so given him Schneider secured the assistance of a number of Oregonians of large local acquaintance. It is unnecessary to name these parties, four of whom have since died leaving relatives who reside within the state. One of these men was operating a quarry in Lincoln County. He took with him from Salem a number of blank applications to purchase state lands and blank assignments of contracts of purchase. He induced his employees to sign these in blank, giving them usually a dollar apiece as an inducement. They considered and testified that they had sold their rights to purchase state lands. The affidavits called for by the statute seem not to have been made. The applicants signed the applications including the affidavits and the jurat was placed thereon by a notary without admin-

istering the oath. Another of those through whom
Schneider operated was a merchant in Portland. He
secured applications in the same manner from his em-
ployees; he then worked the neighborhood gathering
in among others a peanut vender whose stand was
near by. Schneider himself was not idle. He secured
applications from the waitresses at the restaurant
where he usually ate. He visited the plant at Linnton
for the canning of horse meat and secured applications
from some of the workmen. These applications signed
in blank were taken to a notary who was induced to
attach his jurat without the presence of the affiant.
One third of the state's price was paid down when
the applications were filed. Under the practice in
the state land office notes for the unpaid balance of the
purchase price were exacted in such cases from the
applicants and the record suggests a wholesale for-
gery of the notes of these dummy applicants. No
applicant who testified has any recollection of signing
notes. The applications and assignments thereof were
signed at the same time in all cases. The considera-
tion paid applicants ran all the way from one dollar
to twenty dollars. Schneider made an effort to secure
some applications at Oregon City through a business
man resident there, but this man refused to be a party
to the conspiracy. Some of the signatures to the appli-
cations were forged. The state was paid in full
shortly after the filing of the applications; in some
cases state deeds ran to the original applicants and
they executed deeds in favor of Hyde, Schneider or
others in whose names titles were taken by the con-
spirators. In no case in which the facts are disclosed
by the testimony did an applicant purchase for his own
benefit; in every instance before signing his applica-
tion he had made a contract, express or implied, for

the disposition of the land. By these methods 2,560 acres of state lands were transferred to Hyde, 7,040 acres to Schneider, 7,040 acres to Flora M. Sherman, who was Hyde's sister-in-law, 4,160 acres to C. W. Clarke, who financed the conspiracy, 17,760 acres to A. S. Baldwin, who was Clarke's son-in-law, and 2,880 acres to H. S. Morris, who was Hyde's uncle, beside sundry smaller acreages to others under Hyde's control. Hyde associated himself with one John A. Benson for the marketing of the selected lands which they expected to secure in lieu of the state lands so acquired. Benson bribed two of the employees of the General Land Office at Washington to expedite these selections. Deeds were executed and recorded in favor of the United States and the right to make selections in lieu thereof was advertised extensively and sold to a great extent. The price paid the state was $1.25 an acre. The selection right sold for $4 and $5 an acre, sometimes more.

10, 11. The defendant Hyde testifies that he had no knowledge of the manner in which these lands were secured from the state until his criminal trial in 1908. It is not possible to give credence to this testimony. Hyde sent Schneider to Oregon, instructed and financed him, equipped him with letters of introduction, all for the purpose of acquiring large bodies of state lands. Hyde was an experienced land dealer and he knew that no purchaser of Oregon state lands could buy more than three hundred and twenty acres and that only for his own use. The fraudulent character of the mission is evidenced by Hyde's instruction to Schneider to pass himself off as a ranch owner who was looking for additional pasture land. The taking of the great bulk of the acreage in names other than Hyde's is a suspicious circumstance. It is admitted that these parties, ex-

cept Clarke, had no interest in the lands conveyed to them. It is not believable that on Schneider's return to San Francisco he made no report of his doings in Oregon to the man who had sent him to Oregon, or that he failed to account for the large sums of money which he had disbursed. Yet Hyde testifies that he made no report and rendered no accounting. Hyde's alarm when he learned in 1902 that Schneider had communicated to a special agent of the Interior Department the methods by which he acquired these lands is inconsistent with Hyde's present claims. Fraud is ordinarily established by circumstantial evidence: *Williamson* v. *North Pacific Lumber Co.,* 42 Or. 153, 160 (70 Pac. 387) ; *Kabat* v. *Moore,* 48 Or. 191, 196 (85 Pac. 506) ; *Clough* v. *Dawson,* 69 Or. 52, 59 (133 Pac. 345; 138 Pac. 233) ; *Saratoga Investment Co.* v. *Kern,* 76 Or. 243, 249 (148 Pac. 1125). A conspiracy may be inferred from circumstances: *Wilson* v. *McCarthy,* 66 Or. 498, 501 (134 Pac. 1189). While the state's evidence is largely circumstantial, it points unmistakably to the conclusion that Hyde was the author of this conspiracy; that its chief purpose was his emolument; that all other participants operated under his direction; that he was in touch at all times with its ramifications.

The lands described in Supplements B and C to this opinion were applied for by seventeen applicants. Six of these applicants have testified in the cause. One of them, C. Christensen, testified that he was working at a quarry in Lincoln County; that the proprietor of the quarry sought out Christensen and his wife. He described the circumstances under which he signed the applications as follows:

"He asked us if we had used our right to school land. I told him no, I had not. Then he wants to know if he

88 Or.—3

could use my name and my right for school land for someone else. Well, I told him I didn't know if that was right, lawful to do that. So he says, 'Yes, it is.' He said he had been clerk of the school land here for four years and it didn't come under the same head as homestead or timber claims, or anything like that, because they bought that land and paid the state cash for it and the state price of the land, or whatever it was; and he says that it was legal to do it. So well, I told him if it would be to his benefit we could because I had all the rights I had ever had left and I thought I didn't need it but if I did he said he would make it all right so I could get my school land if I wanted it hereafter.

"Q. How was that to be done?

"A. Well, I didn't ask him how he could do it because I didn't think he could after I signed my right away once. And so he come to my house that evening and them papers was made out—wasn't made out; they were blanks; they were not filled out; and I signed my name to them papers. So he said,—well, he asked if the notary public man, named Marion Mays, was home; he wants to know was the notary public over there; but he didn't happen to be home, but he says he will take them to Salem with him and make them out himself because he was a notary public himself, and it was filled out here. And he paid,—he says we should take a dollar, because there had to be money in consideration to make it legal.

"Q. Where did you sign these papers?

"A. In my home in Morrison."

The testimony of the other five applicants is to the same purport. The circumstances under which five additional applicants made their applications are proved by the testimony of members of their families. Two of the agents whom Schneider secured to assist him testified in another cause as to the manner in which the other six applications were secured and this testimony has been received in this cause by stipulation.

In all of these seventeen cases the applications were made for Hyde's benefit and the parties had made arrangements to dispose of the land before they applied for it. The affidavits, if made at all, were false.

12. The defendants contend that the facts proved do not justify the cancellation of the state deeds. The argument is that the lands secured by Hyde were for sale at $1.25 an acre; that through the activities of Hyde they were marketed at the state's price and that therefore the state was not damaged. A number of authorities are cited to the point that fraud without damage furnishes no ground for action: *Reynolds* v. *Evans*, 123 Md. 365 (91 Atl. 564); *Reay* v. *Butler*, 69 Cal. 572 (11 Pac. 463, 467); *Woodson* v. *Winchester*, 16 Cal. App. 472 (117 Pac. 565); *United States* v. *Conklin*, 169 Fed. 177, 183. The general rule announced by these authorities is well established, but it has no application to this kind of a case. It is the policy of the State of Oregon to sell its school lands only to certain classes of purchasers and in amounts not exceeding three hundred and twenty acres to each applicant. It is actionable fraud to secure these lands by false affidavits in violation of the statutory provisions for their sale. *State* v. *Carlson*, 40 Or. 565, 568 (67 Pac. 516), was a suit to cancel a state deed on the ground that the grantee was an alien when he made his application to purchase. Mr. Chief Justice BEAN said:

"The right to recover is not based upon the fact that defendant was an alien, but because he did not belong to the class authorized to purchase state lands, and that he obtained the title by a false affidavit. The fact that his alienage differentiated him from the class is a mere incident,—of no more consequence in determining the question than if his disqualification had been caused by some of the other statutory requisites. The sole inquiry is whether at the time of the purchase

and the execution and delivery of the deed he belonged to the class authorized to purchase, and whether the state land board was induced to make the conveyance to him by a misrepresentation of existing facts. If, as is admitted, he was not a qualified purchaser at the time, he clearly obtained the title to state lands upon a false affidavit and in violation of law; and, in our opinion, no subsequent act of his can cure the defect therein. His affidavit accomplished the purpose intended, and was the means by which the state was induced to part with its title, and a fraud was thereby committed."

The rule announced in the foregoing decision is in harmony with that which obtains in the federal courts in the enforcement of the public land statutes. It has been held many times that patents based on collusive and fraudulent entries will be set aside, notwithstanding the fact that the United States has received the full purchase price of the land: See, for example, *Hyde* v. *Shine,* 199 U. S. 62, 81 (50 L. Ed. 90, 25 Sup. Ct. Rep. 760) ; *United States* v. *Detroit etc. Lumber Co.,* 200 U. S. 321, 328 (50 L. Ed. 499, 26 Sup. Ct. Rep. 282) ; *Hyde* v. *United States,* 35 App. D. C. 451, 488, 489; *Taylor* v. *United States,* 231 Fed. 938, 939. Nor is it necessary as a condition to relief in such a suit that the purchase price of the property be restored or tendered: *Causey* v. *United States,* 240 U. S. 399, 402 (60 L. Ed. 711, 36 Sup. Ct. Rep. 365).

The claim that the state has profited by the conspiracy will not bear analysis. The market value of the lands involved in this suit was created not by Hyde, but by the act of Congress approved June 4, 1897. If the lands of the state available for exchange under that statute had been sold only to qualified purchasers in amounts not exceeding three hundred and twenty acres to each purchaser, the probabilities are

that only small portions of the acreage available for base would have been sold at $1.25 per acre and the bulk of the lands involved in this suit would have remained available to be sold at higher prices. It appears from Governor Chamberlain's message to the legislature of 1907, received in evidence, that the State Land Board had raised the prices of these lands available as base successively to $2.50, $6.00 and $7.50 an acre.

13. These appellants, other than Hyde, claim to be innocent purchasers. We have already sufficiently indicated their relation to the controversy. The evidence shows that Western Lumber Company, Anaconda Copper Mining Company, Henry Hewitt, Jr., Martin Barrett, O. S. Lewis, Mrs. Theodore Hampe, Rock Springs Land and Cattle Company, Riverside Land and Livestock Company, Willamette Pulp and Paper Company, Alger Logging Company and Cedar Sheep Association paid value for the rights which they are asserting and that they parted with their money without notice of the fraud alleged in this suit. But they are asserting no rights in the base lands except that it be adjudged that title to these lands has passed to the United States. They claim selected lands through the relinquishment of these base lands and their title to the selected lands is dependent on the title of the United States to the base lands. We have seen that the United States has acquired no title to the base lands listed in Supplements B and C. It follows that the defendants last above named have no interest in these lands and the question as to whether they are *bona fide* purchasers of something else is immaterial to the present controversy.

14. The defendant C. W. Clarke Company is less favorably situated. It claims a large body of selected

lands in the State of Washington under four deeds. Two of these deeds run from Clarke and his wife, one from Hyde and his wife, and one from F. A. Hyde and Company, a corporation. All of these deeds recite a nominal consideration. The claim of this defendant is that Clarke advanced large sums of money to Hyde and that to secure him the lands covered by three of these deeds were put in the name of Clarke and of F. A. Hyde and Company, nearly all of the stock of the latter corporation being held by Clarke. The corporation C. W. Clarke Company was organized by Clarke; its stock was issued wholly to Clarke and his family. It is claimed that this corporation has succeeded to the debt owing from Hyde to Clarke and that all of the selected lands described in these four deeds are held as security therefor. The corporation can stand in no better position than Clarke. It appears from Hyde's testimony that Clarke advanced $64,000 which was the entire capital used by Hyde in his operations in Oregon; that Hyde agreed to pay interest on these advances at the rate of one and one-half per cent a month; that Clarke was in Hyde's office nearly every day; that he signed powers of attorney in blank and left them with Hyde so that Hyde could dispose of lands which stood in Clarke's name. Hyde's collections in most cases came to Clarke. We have already stated that a large share of the acreage stood in the name of Clarke and his son-in-law, A. S. Baldwin. Clarke signed countless documents to assist Hyde in his operations. Hyde's business consisted chiefly in the transactions above recounted and in similar transactions in other territories. Clarke was financing an unlawful business. We think the evidence establishes that Clarke was a party to the

conspiracy. He cannot be held to be an innocent purchaser.

15. The answer of Western Lumber Company contains the following allegation:

"That patents for said selected lands have never been issued by the United States, and that charges have been preferred by the Land Department against the validity of the selections aforesaid in lieu of the base lands described in paragraph III of said Second Amended Complaint, charging that the title to said base lands was procured from the State of Oregon fraudulently and by corrupt practices and in violation of the statutes of the State of Oregon; that such charges are still pending undecided."

The other answers contain similar allegations and these allegations are sustained by the evidence. It is argued from these facts that the General Land Office has exclusive jurisdiction of this controversy and that the courts cannot determine the rights of the parties until the administrative branch of the government has finally acted. It is said by Mr. Justice PECKHAM in *Cosmos Exploration Co.* v. *Gray Eagle Oil Co.,* 190 U. S. 301, 315 (47 L. Ed. 1064, 23 Sup. Ct. Rep. 692, 24 Sup. Ct. Rep. 860):

"Concluding, as we do, that the question whether the complainant has ever made a proper selection of land in lieu of the land relinquished, has never been decided by the Land Department, but is still properly before that department, the courts cannot take jurisdiction and proceed to decide such question themselves. The Government has provided a special tribunal for the decision of such a question arising out of the administration of its public land laws, and that jurisdiction cannot be taken away from it by the courts."

The doctrine so announced is well established and has been recognized by this court: *Weatherford* v. *McKay,* 59 Or. 558, 564, 565 (117 Pac. 969). See, also, *Oregon*

v. *Hitchcock,* 202 U. S. 60, 70 (50 L. Ed. 935, 26 Sup.
Ct. Rep. 568). But the jurisdiction of the General
Land Office is confined to the public domain: *Knight*
v. *United Land Assn.,* 142 U. S. 161 (35 L. Ed. 974, 12
Sup. Ct. Rep. 258). The General Land Office has no
control of lands offered to the United States under the
act of 1897 until it signifies its acceptance of the offer
and thereby vests the title in the United States. When
this is done, the jurisdiction of the administrative
bureau attaches and the courts will not interfere with
its operations until it has disposed of the matter. This
rule prevents us from proceeding with so much of the
controversy as involves the lands listed in Supple-
ment A, but it does not relieve us of the duty of de-
termining the rights of plaintiff to the lands listed in
Supplements B and C. There is nothing to prevent
the withdrawal of the offer of these latter lands to
the government at any time: *Roughton* v. *Knight,* 219
U. S. 537, 548 (55 L. Ed. 326, 31 Sup. Ct. Rep. 297).
The United States having no interest in them, the Gen-
eral Land Office has no control over them.

16. It is next contended that plaintiff has been guilty
of laches and that for this reason its suit should be dis-
missed. We are committed to the principle that the
doctrine of laches is applicable to the state: *State* v.
*Warner Valley Stock Co.,* 56 Or. 283, 304 (106 Pac. 780,
108 Pac. 861). In *United States* v. *White,* 17 Fed. 561,
565 (9 Sawy. 125), Judge Sawyer says:

"Although statutes of limitation do not run against
the government, yet the staleness of the claim may be
taken into consideration in determining the question
whether a court of equity should interfere and grant
relief when the United States, as well as a natural
person is a complainant. When the United States
comes into a court of equity as a suitor, it is subject
to the defenses peculiar to that court."

In *Commonwealth* v. *Bala & B. M. Turnpike,* 153 Pa. St. 47, 53 (25 Atl. 1105, 1106), Mr. Justice POTTER says:

"Time, together with other elements, may make up a species of fraud, and estop even sovereignty from exercising its legal rights."

17. Is it inequitable to grant plaintiff the relief to which it is otherwise entitled because of the delay in bringing this suit? The fraudulent applications were filed from July to November, 1898; most of them in August. This suit was brought August 13, 1913, fifteen years after the cause of action arose. It was a circumstance of suspicion that one hundred and forty-six applications should be made in so short a time to purchase state lands in the forest reserves, especially as these lands were for the most part in remote, inaccessible sections of the state. It was also a suspicious circumstance that deeds should issue in so short a time to a handful of nonresidents transferring many thousands of acres of state lands. These matters seem to have passed unnoticed by the state officials. In *Hall* v. *Catherine Creek Dev. Co.,* 78 Or. 585, 593 (153 Pac. 97), Mr. Justice BURNETT says, in speaking of the notice which will charge a party defrauded with the duty of asserting his rights:

"The notice must be more than would excite the suspicion of a cautious and wary person."

This language was adopted from the opinion of Mr. Justice WOLVERTON in *Raymond* v. *Flavel,* 27 Or. 219, 246, 247 (40 Pac. 158). It is also the doctrine of *Crossen* v. *Oliver,* 37 Or. 514, 521 (61 Pac. 885); and *Coffey* v. *Scott,* 66 Or. 465, 467 (135 Pac. 88). Laches is therefore not imputable to the state in its failure to act at the inception of the fraud.

18. The evidence fails to charge the state with further notice except rumors, till 1905. The message of Governor Chamberlain to the legislature of that year called attention to abuses which had grown up in the administration of state lands and on April 28, 1905, the grand jury for Marion County reported to the Circuit Court for that county that there had been gross violations of law in taking up state lands. These charges were general; they did not refer particularly to the applications with which we are concerned in this case.

During the year 1904 rumors of fraud in some of the applications reached the ears of Hon. Oswald West, State Land Agent, and in 1905 he made a trip to Lincoln County to investigate the applications secured there from the workmen at the quarry. He followed this up with a trip to Portland to investigate the Hyde applications secured there. He was advised by applicants whom he interviewed on these trips of the circumstances under which they had executed their applications.

In the meantime the defendant Schneider became estranged from Hyde and as a result of their changed relations Schneider got in communication with a special agent of the Interior Department and informed him in November, 1902, of the manner in which these applications were obtained. An investigation by the federal authorities followed and on February 17, 1904, Hyde, Schneider and two others were indicted in the District of Columbia on the charge of conspiracy to acquire public lands unlawfully. Some of the counts in the indictment were based on the transactions involved in this case and the effort to secure selected lands in lieu of the base lands acquired by these fraudulent applications. The evidence shows that the state

officials furnished the federal authorities with such in-
formation as they had with reference to these transac-
tions, but it does not show that the state officials were
advised of the facts run down by the federal govern-
ment until the trial of Hyde and Schneider.

Hyde resisted extradition from California to the
District of Columbia, appealing to the Supreme Court
of the United States from a judgment denying his ap-
plication for a writ of *habeas corpus*.   The appellate
court decided against him May 29, 1905.   The criminal
charges were set for trial in 1907, but the trial was
postponed until 1908, when Hyde and Schneider were
tried and convicted.   Hyde appealed and the judg-
ment of conviction was affirmed June 10, 1912.

While these criminal charges were pending, and
especially in the year 1908, the state officials were
working with special agents of the Interior Depart-
ment, each helping the others to ascertain the facts
and marshal the evidence.   The state's records were
sent to Washington twice for the use of the federal
officials and remained there from 1908 until November
21, 1912, when they were returned in response to re-
peated demands from George G. Brown, clerk of the
State Land Board.   The facts with reference to these
entries were fully disclosed at the trial of Hyde and
Schneider in 1908, but the records needed for drafting
a complaint and trying the case were not available
for four years thereafter.

During the lapse of these years a number of wit-
nesses have died; the San Francisco fire destroyed
Hyde's books and papers; the defendants have been
in possession of the selected lands and have been at
expense for taxes and fire patrol.

It is to be said that notwithstanding the time which
has elapsed the evidence is remarkably clear that there

was a conspiracy as alleged; that the bulk of the state lands acquired by Hyde were secured fraudulently and that appellants other than Hyde and C. W. Clarke Company are in nowise connected up with the fraudulent operations complained of. The defendant Clarke died some four months after this suit was brought, after a considerable period of disability. We cannot think that he could explain away the circumstances which connect him with the conspiracy and he certainly could not disprove its existence.

It is contended that the innocent defendants have lost their remedy over against Hyde through the state's delay in bringing suit. It clearly appears that Hyde is now insolvent, but it is not satisfactorily shown that he was able to respond in damages when the state became aware of his frauds. The evidence indicates an effort on his part to cover up or dispose of his assets immediately after his indictment in February, 1904.

We think that the state should ordinarily move in vindication of its rights in less than fifteen years from the accrual of its cause of suit, but this case is differentiated from ordinary litigation. This is but one of seven suits brought in as many different counties. The marshaling of the facts has involved a vast amount of investigation and of painstaking labor. The ascertainment of the facts necessary to the drafting of the complaint required the expenditure of a large sum of money and consumed a great deal of time.

The charges in plaintiff's pleadings reflect on the integrity of a number of citizens of the state, some living and some dead. The law officers of the commonwealth were not justified in making these charges without careful investigation of the facts and assurance that the proposed action was justified.

The present Attorney General knew, and presumably his predecessor knew, that the state's remedy was problematical in the absence of the United States as a party. Some delay would be justified in efforts to secure its appearance.

We have seen that the fraud was not discovered until 1905 and the full story was not known until 1908. By that time the position of the innocent defendants had become fixed. The condition and intrinsic value of the base lands have not changed appreciably; in this respect the case is differentiated from *United States v. Flint,* 4 Sawy. 42 (25 Fed. Cas. (No. 15,121) pp. 1107, 1113, 1114), on which the defendants rely.

In 10 R. C. L. 405, it is said:

"Laches signifies not only an undue lapse of time, but also negligence in failing to act more promptly."

On the whole case we think that laches is not imputable to plaintiff.

19. It is finally contended that these titles have been confirmed by an act of the legislature. In Smith on Fraud, Section 136, page 157, the author says:

"When the original transaction is infested with fraud the confirmation of it is so inconsistent with justice and so likely to be accompanied with imposition that courts watch it with the utmost strictness and do not allow it to stand but on the clearest evidence."

This was said with reference to the ratification of contracts tainted with fraud. If the rule is as stated when applied to business contracts, it should be stated in even stronger terms when applied to the state. It should not be assumed that the legislature has ratified sales of land secured by fraud so gross as that proved in this case, unless the language of the act leads unmistakably to that conclusion.

20. The act relied on by the defendants on this branch of the case is that approved February 27, 1901, and found in the Session Laws for that year on pages 304, 305. It is as follows:

"AN ACT

"Authorizing the Board of Commissioners for the Sale of School and University Lands to bid in certain lands sold under foreclosure of mortgages and to lease and sell the same, ratifying purchases heretofore made, and confirming and validating all sales made by said board.

"Be it enacted by the Legislative Assembly of the State of Oregon:

"Section 1. The Board of Commissioners for the Sale of School and University lands are hereby authorized and empowered to, in their discretion, bid in at its true cash value any land sold under foreclosure of mortgage given to secure a loan from the school fund or other trust funds under the management and control of said board, or they may accept a release of the equity of redemption and take such land at its true cash value, when necessary to secure the fund from loss; and all such purchases heretofore made are hereby ratified and confirmed. The board shall keep a correct record of all such purchases, with a description of the lands purchased and a statement of the fund to which they belong, and such lands shall be held for sale, subject to annual lease, and sold as opportunity may offer on the best terms obtainable, and the proceeds placed to the credit of the irreducible fund from which the loan was made, to the amount of the principal of said loan, and the excess, if any, to the interest account of said fund. *That all sales of land heretofore made by said board are hereby ratified and confirmed, and whenever the full purchase price thereof shall have been paid title in fee simple shall vest in the purchasers, their successors or assigns.*

"Section 2. Inasmuch as there is urgent need for the correction of the present law, this act shall take

effect and be in force from and after its approval by the Governor.''

The language italicized is that which is relied on by the defendants.   This is a remedial act.   It is said in 1 Blackstone, 87, that:

''There are three points to be considered in the construction of all remedial statutes; the old law, the mischief, and the remedy; that is, how the common law stood at the making of the act; what the mischief was, for which the common law did not provide; and what remedy the parliament hath provided to cure this mischief.   And it is the business of the judges so to construe the act as to suppress the mischief and advance the remedy.''

What was the law on the subject covered by this statute prior to its enactment, and wherein was the old law mischievous?   The functions of the State Land Board, speaking broadly, are twofold.   They are charged with the sale of the state lands and also with the care and investment of the school funds arising from such sales.   The law authorizes the loaning of these funds on farm mortgages and a heavy responsibility devolves on the Board in the making of these loans and in the collection of the interest and principal as they mature.   In 1899 the legislature enacted a statute which revised the law governing the functions of the State Land Board and repealed earlier statutes on the subject: Session Laws 1899, pp. 156–164.   Section 27 of this act is as follows:

''It shall be the duty of the board to foreclose immediately all mortgages which are not adequate security for the debt or upon which there is more than one year's interest in arrears, and they may, in their discretion, bid in the land in the name of the state at its true cash value, or they may accept a release of the equity of redemption and take the land at its true cash

value when necessary to secure the fund from loss, and all such purchases heretofore made—''

It is apparent that a mistake was made in drafting this section and the result of the mistake was a want of express power in the State Land Board to sell and convey properties bid in at foreclosure sales. This error was called to the attention of the legislature in 1901 by the message of Governor Geer, found in the Senate Journal for that year at pages 23, 24:

''Section 26 of Senate Bill 126, Laws 1899, provides that the State Land Board shall proceed immediately to 'foreclose all mortgages which are not adequate security for the debt, or upon which there is more than one year's interest in arrears.' In obedience to this requirement, the board has foreclosed one hundred and sixty mortgages, using as much leniency as was compatible with the public interest. By reference to this section you will notice that it terminates abruptly in the middle of the sentence. Investigation has shown that the perfected bill which passed both houses and was regularly signed by their officers, contains the remainder of the section which proceeds to authorize the board to sell all lands secured by foreclosure of mortgages, to give title to the same, and confirms purchases already made. This important part of the bill, as it passed both houses, was omitted by some clerk on the enrolling committee and does not appear in the enrolled bill, a copy of which was sent to the State Printer. Having this knowledge, the State Land Board has proceeded to sell as much of these lands as possible through the State Land Agent.''

The Governor's message then advised the legislature of the number and the value of the properties which had been purchased for the state at foreclosure sales and called attention to the fact that ninety-two farms so purchased had been sold by the state for the aggregate price of $165,935. In concluding this portion of his message the Governor said:

"It will be your duty to amend the section of the law to which I have just referred, in accordance with its well-defined intention."

The act in question was passed pursuant to this recommendation. It is the duty of the court to take notice of the conditions obtaining at the time when a law is enacted: *Keith* v. *Quinney,* 1 Or. 364, 366; *Smith* v. *Smith,* 3 Or. 363, 365; *State* v. *Young,* 74 Or. 399, 403 (145 Pac. 647).

It will be noted that with the possible exception of the sentence on which the defendants rely, no part of the act relates to the sale of the state's granted lands. Every other provision has to do with the functions of the State Land Board in acquiring lands pledged to it as security for its loans and in the sale of such lands. While the language relied on by the defendants is susceptible of the construction for which they contend, they are asking us to take a sentence from the act of 1901 and apply it to a subject foreign to that on which the legislature was acting. Judge Endlich, in his work on the "Interpretation of Statutes," Section 73, says:

"The words of a statute are to be understood in the sense in which they best harmonize with the subject of the enactment and the object which the Legislature has in view. Their meaning is found not so much in a strictly grammatical or etymological propriety of language, nor even in its popular use, as in the subject or in the occasion on which they are used, and the object to be attained. * * And equally the construction ought to be with reference to the object to be accomplished by the act, and to keep in view the conditions existing."

In Lewis' Sutherland on Statutory Construction (2 ed.), Section 347, it is said:

"It is indispensable to a correct understanding of a statute to inquire first what is the subject of it, what

object is intended to be accomplished by it. When the subject matter is once clearly ascertained and its general intent, a key is found to all its intricacies;—general words may be restrained to it, and those of narrower import may be expanded it to effectuate that intent."

*Verba generalia restringuntur ad habilitatem rei vel personae.* In his exposition of this maxim, Broom says, Legal Maxims (8 ed.), pp. 503, 504:

"Lastly, it is said to be a good rule of construction, that, 'where an Act of Parliament begins with words which describe things or persons of an inferior degree and concludes with general words, the general words shall not be extended to any thing or person of a higher degree,' that is to say, 'where a particular class (of persons or things), is spoken of, and general words follow, the class first mentioned is to be taken as the most comprehensive, and the general words treated as referring to matters *ejusdem generis* with such class,' the effect of general words when they follow particular words being thus restricted."

These principles have been recognized several times by this court. In 1864 the legislature passed an act regulating the transaction of business in this state by "foreign insurance, banking, express and exchange corporations." Section 7 of this act, found in the Deady and Lane Code, Volume 2, page 617, is as follows:

"A foreign corporation, before transacting business in this state, must duly execute and acknowledge a power of attorney, and cause the same to be recorded in the county clerk's office, of each county where it has a resident agent, which power of attorney, so long as such company shall have places of business in the state, shall be irrevocable, except by the substitution of another qualified person for the one mentioned therein, as attorney for such company."

Section 8 of the act imposed further requirements in similar language. Although these sections of the

act were broad enough in their language to include all
foreign corporations doing business in Oregon, they
were held applicable only to foreign insurance, bank-
ing, express and exchange corporations in accordance
with the subject matter of the act as defined by its
title: *Singer Mfg. Co.* v. *Graham,* 8 Or. 17, 22 (34 Am.
Rep. 572). In *State* v. *Fisher,* 53 Or. 38, 42, 43 (98 Pac.
713), the court construed a game law which inhibited
the hunting of deer between November 1st and July
15th. The act then provided:

"Any person * * having in his possession any deer,
or carcass, or part of a deer, during the season when
it is unlawful to take or kill such deer, shall be guilty
of a misdemeanor."

The interpretation of this language was controlled
by the subject matter of the act and the intent of the
legislature to be gathered therefrom. It was held that
the act forbade only the possession of the carcass of
a deer killed in closed season.

In *Wong Sing* v. *Independence,* 47 Or. 231, 235, 236
(83 Pac. 387), the court construed an ordinance of the
City of Independence which forbade the sale of liquor
in quantities less than a gallon without first securing
a license therefor. Section 7 of the ordinance was in
part as follows:

"Any person who shall sell * * any * * liquors
without first having obtained a license for that pur-
pose as in this ordinance provided, shall upon con-
viction thereof * * be punished * * ."

This language was restricted by the subject matter
of the act as applying only to sales in quantities less
than a gallon.

The case of *State* v. *Carlson,* 40 Or. 565, 569, 570
(67 Pac. 516), is still more closely in point. A suit
had been brought to set aside a state patent to tide-

lands on the ground that the purchaser was not qualified to purchase. He defended in part on the ground that in 1899 the legislature had passed an act confirming purchases of tide-lands theretofore made. Mr. Chief Justice BEAN reviewed the circumstances leading up to the enactment of this statute and concluded that the defendant's case was without its purview. The language relied on in that statute, like the language relied on by these defendants, was broad enough, standing alone, to confirm the title attacked, but the statute as a whole, read in the light of the old law, the mischief and the remedy, manifested a narrower legislative intent in accordance with which the act was construed.

21. It is elementary that a statute is to be interpreted in accordance with the legislative intent: *Duncan* v. *Dryer,* 71 Or. 548, 557 (143 Pac. 644). We are satisfied that the act of 1901 was passed to correct an error in drafting the act of 1899; that it relates to purchases made by the state on the foreclosure of school fund mortgages; that it authorizes the sale of lands so purchased and confirms such sales theretofore made by the State Land Board; that the act has no reference to the sale of the state's grant lands and that it was not intended to confirm fraudulent purchases of such grant lands. The statute therefore presents no bar to the prosecution of this suit.

22. Plaintiff prays for an accounting as against the defendant Hyde of all moneys received by said defendant "from the use and benefit of the lands" described in plaintiff's pleading and particularly of the moneys received from the sale of the patented lands. Plaintiff cannot have both the lands and the money secured by Hyde through their attempted exchange. As it is entitled to the lands listed in Supplements B and C,

it can have no accounting as to these lands.  We are unwilling to assume that the federal government will long maintain its present inconsistent attitude with reference to the lands listed in Supplement A, and we think that the title to these lands must therefore be considered to be in abeyance.  Until it be finally determined that these lands cannot be restored to the state, plaintiff should not recover their price or value.  There are also serious objections to an accounting in this suit for the price or value of the state lands surrendered as base for the patented lands.  These lands are only in part described in the complaint.  The relief demanded is ancillary to the cancellation of the state deeds prayed for.  Plaintiff's right to this character of relief in this suit is based on the principle that equity delights to do complete justice.  The record does not contain sufficient data on which to give a complete accounting.  Only fragmentary relief could be accorded in this suit.  It is much better that the accounting be had in a subsequent suit after the questions of title have been finally adjudicated and when the rights of the parties on this branch of the controversy can be fully determined.  The decree will be without prejudice to plaintiff's right to an accounting against Hyde and such other parties to the conspiracy as plaintiff shall be advised to proceed against.

It follows that the lands listed in Supplements B and C should be restored to plaintiff; the deeds by which they were conveyed to Hyde and his associates should be canceled; as to the lands listed in Supplement A, the complaint should be dismissed without prejudice.  Plaintiff will recover costs in the Circuit Court of the defendants Hyde, Schneider, F. A. Hyde and Company and C. W. Clarke Company; in this court plaintiff will recover costs of the defendants

Hyde and C. W. Clarke Company. We are not clear that the defendants Flora M. Sherman, Harry S. Morris and A. S. Baldwin are sufficiently connected with the conspiracy to justify a judgment for costs against them. The defendants who have paid cash for selection rights are co-victims with the state of the fraud of Hyde and his associates. The state should not recover costs as against them, nor should they recover as against the state.

We have been at great pains to list accurately the lands described in the supplements to this opinion; but the record is very voluminous and it is possible that we have overlooked something which would make a difference. Counsel who have been working on this case for four years are more familiar with it than we can hope to be after eight weeks' consideration of the record. Any errors which may be pointed out in these tabulations will be corrected.

The decree of the lower court is modified.

MODIFIED. REHEARING DENIED.

## SUPPLEMENT A.

## LANDS OFFERED AS BASE FOR LIEU SELECTIONS AND ACCEPTED.

|  | Acres. |
|---|---|
| NW. ¼ of NE. ¼, SW. ¼ of NE. ¼ and SE. ¼ of Sec. 36, t. 21 s. r. 6 e. ........ | 240 |
| Section 36, t. 21 s. r. 7 e. ............... | 640 |
| 8.76 acres of Lot 2, Sec. 36, t. 22 s. r. 7 e. .... | 8.76 |
| Section 16, t. 19 s. r. 7 e. ................. | 640 |
| Section 16, t. 19 s. r. 8 e. ................. | 640 |
| Section 16, t. 19 s. r. 9 e. ................. | 640 |
| N. ½ of Sec. 16, t. 18 s. r. 7 e. ............. | 320 |
| S. ½ and NE. ¼ of Sec. 16, t. 18 s. r. 9 e..... | 480 |

|  | Acres. |
|---|---|
| S. ½ and 5.62 acres in N. ½ of Sec. 36, t. 18 s. r. 9 e. | 325.62 |
| Section 36, t. 18 s. r. 7 e. | 640 |
| SW. ¼ of SW. ¼ of Sec. 36, t. 20 s. r. 7 e. | 40 |
| S. ½ of SW. ¼ and NE. ¼ of SW. ¼ of Sec. 16, t. 21 s. r. 7 e. | 120 |
| W. ½ of Sec. 16, t. 20 s. r. 8 e. | 320 |
| N. ½ of Sec. 36, t. 20 s. r. 8 e. | 320 |
| 30.05 acres in NE. ¼ of SE. ¼ of Sec. 16, t. 21 s. r. 8 e. | 30.05 |
| E. ½ and SW. ¼ of SW. ¼, NW. ¼ of SW. ¼ and NW¼ of Sec. 16, t. 12 s. r. 9 e. | 560 |
| Section 36, t. 12 s. r. 9 e. | 640 |
| W. ½ of Sec. 36, t. 13 s. r. 9 e. | 320 |
| SE. ¼ of Sec. 36, t. 13 s. r. 9 e. | 160 |
| SE. ¼ and S. ½ of SW. ¼ of Sec. 36, t. 14 s. r. 9 e. | 240 |
| W. ½ of Sec. 16, t. 16 s. r. 9 e. | 320 |
| Section 16, t. 17 s. r. 9 e. | 640 |
| Section 36, t. 15 s. r. 9 e. | 640 |
| Section 36, t. 17 s. r. 9 e. | 640 |
| N. ½ of SE. ¼ and SW. ¼ of SE. ¼ of Sec. 36, t. 19 s. r. 9 e. | 120 |
| E. ½ of SW. ¼ and SW. ¼ of SW. ¼ of Sec. 36, t. 20 s. r. 9 e. | 120 |
| SE. ¼ of NE. ¼ and SE. ¼, SW. ¼ of NW. ¼ and SW. ¼ of Sec. 16, t. 20 s. r. 9 e.. | 400 |
|  | 10,204.43 |

## SUPPLEMENT B.

### LANDS OFFERED AS BASE FOR LIEU SELECTIONS BUT NOT ACCEPTED.

|  | Acres. |
|---|---|
| NW. ¼ of SW. ¼ and SE. ¼ of NW. ¼ of Sec. 16, t. 21 s. r. 6 e. | 80 |
| Section 36, t. 22 s. r. 6 e. | 640 |
| NW. ¼ of NW. ¼ of Sec. 16, t. 20 s. r. 9 e. | 40 |
| SE. ¼ of SE. ¼ of Sec. 16, t. 20 s. r. 8 e. | 40 |
| Lots 1, 2 and 3, Sec. 16, t. 20 s. r. 7 e. | 28.80 |
| NW. ¼ of Sec. 36, t. 22 s. r. 9 e. | 160 |
| S. ½ of Sec. 16, t. 20 s. r. 7 e. | 320 |
| NW. ¼ of Sec. 36, t. 20 s. r. 7 e. | 160 |
| Section 16, t. 22 s. r. 9 e. | 640 |
| W. ½ of NW. ¼, SE. ¼ of NW. ¼ and SW. ¼ of NE. ¼ of Sec. 16, t. 20 s. r. 7 e. | 160 |
| SE. ¼ of NE. ¼, E. ½ of SE. ¼ and SW. ¼ of SE. ¼ of Sec. 36, t. 22 s. r. 9 e. | 160 |
| Section 16, t. 22 s. r. 7 e | 640 |
| SE. ¼ of SW. ¼ and S. ½ of SE. ¼ of Sec. 36, t. 20 s. r. 7 e. | 120 |
| 9.95 acres in NE. ¼ of SE. ¼ of Sec. 16, t. 21 s. r. 8 e. | 9.95 |
| NW. ¼ of NE. ¼ and S. ½ of NE. ¼ of Sec. 36, t. 20 s. r. 9 e. | 120 |
| S. ½ of Sec. 16, t. 21 s. r. 9 e. | 320 |
|  | 3,638.75 |

## SUPPLEMENT C.

## LANDS NEVER OFFERED AS BASE FOR LIEU SELECTIONS.

|  | Acres. |
|---|---|
| SW. ½ of SW. ¼ of Sec. 36, t. 21 s. r. 6 e. .... | 40 |
| Lots 1, 2 and 3 in Sec. 16, t. 21 s. r. 7 e. ....... | 120 |
| SE. ¼ of SE. ¼ of Sec. 16, t. 21 s. r. 7 e....... | 40 |
| Lots 1, 3, 4 and 30.04 acres of Lot 2, in Sec. 36, t. 22 s. r. 7 e. ............................... | 51.56 |
|  | 251.56 |

Denied March 19, 1918.

PETITION FOR REHEARING.

(171 Pac. 582.)

On petitions for rehearing and motion for modification. Motion sustained in part, and petition for rehearing is denied.

*Mr. A. C. Shaw,* for the petition and motion.

*Mr. George M. Brown,* Attorney General, and *Mr. John O. Bailey,* Assistant Attorney General, *contra.*

In Banc.

McCAMANT, J.—The defendants have presented an able argument in support of their petition for a rehearing. It is earnestly contended that we have misapprehended the effect of the evidence on the question of laches. There is room for a difference of opinion as to the date when the state became chargeable with notice of the frauds upon which this suit is based, but we are satisfied upon the whole case of the correctness of our conclusions in this behalf as

stated in the former opinion. A re-examination of
the evidence to which our attention is directed con-
firms our conclusions that C. W. Clarke was not an in-
nocent purchaser.

23. Defendants complain that we have not noticed
the act of Congress approved March 3, 1905, repealing
the legislation under which the base lands were relin-
quished. This act is as follows:

"That the Acts of June fourth, eighteen hundred
and ninety-seven, June sixth, nineteen hundred, and
March third, nineteen hundred and one, are hereby
repealed so far as they provide for the relinquishment,
selection and patenting of lands in lieu of tracts cov-
ered by an unperfected *bona fide* claim or patent
within a forest reserve, but the validity of contracts
entered into by the Secretary of the Interior prior to
the passage of this Act shall not be impaired: *Pro-
vided,* That selections heretofore made in lieu of lands
relinquished to the United States may be perfected
and patents issue therefor the same as though this
Act had not been passed, and if for any reason not
the fault of the party making the same any pending
selection is held invalid another selection for a like
quantity of land may be made in lieu thereof."

The conclusions announced in our former opinion
restore to plaintiff the base lands which were acquired
fraudulently, which were conveyed by guilty parties
to the United States and which have never been ac-
cepted by the General Land Office. We find no pro-
vision in the above statute which amounts to an accept-
ance of the deeds of relinquishment by which these
properties were conveyed. In the absence of accept-
ance by the United States no title passed by these deeds.
We showed in our former opinion that the United States
will not knowingly accept a conveyance of land from
a party whose title is acquired by fraud. We should
not lightly impute to Congress an intention to depart

from this salutary rule. Until the conveyance of the
base lands has been accepted by the United States
there can be no contract entitled to enforcement under
the repealing statute.

It is argued in support of plaintiff's petition for a
rehearing that title to the base lands did not pass until
the selections were approved for patent. This con-
tention is out of harmony with the doctrine of *Daniels*
v. *Wagner,* 237 U. S. 547 (Ann. Cas. 1917A, 40, 59 L. Ed.
1102, 35 Sup. Ct. Rep. 740), and *Sawyer* v. *Gray,* 237
U. S. 674 (59 L. Ed. 1170, 35 Sup. Ct. Rep. 842), which
seem to us to overrule *Clearwater Timber Co.* v. *Sho-
shone County,* 155 Fed. 612, on which plaintiff largely
relies.

24. Our attention is called to the fact that many of
the selections cover unsurveyed lands and that under no
circumstances can lands be patented prior to survey.
It is argued that as the General Land Office could not
issue patents to these selected lands at the date when
they were selected, it was without jurisdiction to accept
deeds to the corresponding base lands. Under the
regulations of the Interior Department the selector of
unsurveyed lands acquired an inchoate right thereto
which ripened into a patent on the survey of the lands
and on compliance by the selector with the rules appli-
cable to such selections: 28 L. D. 523; 29 L. D. 393;
*Daniels* v. *Northern Pacific,* 43 L. D. 381, 384; *Clarke* v.
*Halverson,* 45 L. D. 54, 55. This was a valuable right;
it was not based on settlement or purchase. Its only
foundation was the conveyance of the relinquished
lands. The existence of this right is inconsistent with
the assumption that the selector retained title to the
base lands. On the acceptance of the conveyance of
these lands by the General Land Office title thereto
passed to the United States. It is true that the selec-
tor's title to the selected lands might fail through non-

compliance with the regulations and that it might then become the duty of the United States to reconvey the base lands, but this possibility does not militate against the correctness of the above conclusions.

Plaintiff calls attention to certain cases in which the data filed in the General Land Office were insufficient to constitute compliance with the regulations and it is contended that in such cases the commissioner was without jurisdiction to accept the deeds of relinquishment and approve the corresponding selections. In this branch of their contention counsel for plaintiff lose sight of the distinction between error and lack of jurisdiction. It may be that the letters of approval criticised by counsel were based on an insufficient showing, but in each case there was a deed of relinquishment and a corresponding selection of government land. In no case was the deed of relinquishment delivered for the creation of a floating right of selection. Plaintiff's authorities sustain its contention that this latter practice is unauthorized by the act of Congress of January 4, 1897: *Roughton* v. *Knight,* 219 U. S. 537, 547 (55 L. Ed. 326, 31 Sup. Ct. Rep. 297); *Western Lumber Co.* v. *Willis,* 160 Fed. 27, 31 (87 C. C. A. 183). In *Cosmos Exploration Co.* v. *Gray Eagle Oil Co.,* 190 U. S. 301, 308, 309 (47 L. Ed. 1064, 23 Sup. Ct. Rep. 692, 24 Sup. Ct. Rep. 860), Mr. Justice Peckham says:

"There can be, as we think, no doubt that the general administration of the forest reserve act, and also the determination of the various questions which may arise thereunder before the issuing of any patent for the selected lands, are vested in the Land Department."

On the delivery of the deeds of relinquishment and the filing of applications to select equivalent acreage, the jurisdiction of the General Land Office attached. The tribunal which formulated the rules of procedure

had authority to determine whether relinquishments and selections conformed thereto. When the General Land Office approved the relinquishments, title to the base lands passed and the title cannot be divested by the decree of a court rendered in a cause to which the United States is not a party.

A few errors have been pointed out in the description and tabulation of properties listed in the supplements to the previous opinion. These errors will be corrected and copies of the supplements in their final form will be furnished the parties.

The petitions for rehearing are denied.

MOTION TO MODIFY SUSTAINED IN PART AND REHEARING DENIED.